No. 23,083.

THE FARM MORTGAGE TRUST COMPANY, *Plaintiff*, v. WALTER E. WILSON, as Bank Commissioner (FRANKLIN H. FOSTER, Substituted) et al., *Defendants.*

SYLLABUS BY THE COURT.

1. STATE BANK GUARANTY FUND—*Deposit Solicited by Stranger to the Bank— Bonus Paid Depositor by the Stranger—Deposit Not a Loan.* A deposit in a bank for which a certificate was issued bearing interest at the rate approved by the bank commissioner is not rendered invalid nor taken out of the protection of the state guaranty fund because it was solicited by a third party not the agent of the bank, and who to advance his own interest paid the depositor a bonus to procure the making of a deposit.

2. SAME—*Certain Arrangements Between Holder of Certificate and the Issuing Bank Did Not Deprive the Holder from Participation in the Guaranty Fund.* An arrangement between the bank issuing the certificate and the plaintiff, to the effect that the bank would maintain a deposit with plaintiff during the life of the certificate, is held not to have been intended to create an absolutely binding obligation, and did not have the effect of

converting the transaction into a loan nor of depriving the holder of the certificate of deposit issued by the bank of the protection of the guaranty fund.

Original proceeding in mandamus.  Opinion filed March 11, 1922.  Writ allowed.

*Clad Hamilton,* and *Clay Hamilton,* both of Topeka, for the plaintiff.

*Richard J. Hopkins,* attorney-general, *John G. Egan,* assistant attorney-general, *J. B. Larimer, A. A. Godard, J. Arthur Myers, Robert Stone, George T. McDermott, Robert L. Webb,* all of Topeka, and *E. H. Gamble,* of Kansas City, Mo., for the defendants.

The opinion of the court was delivered by

JOHNSTON, C. J.:  The Farm Mortgage Trust Company, which makes deposits in other banking and trust institutions, brought this action to compel the bank commissioner to issue to it a certificate payable out of the bank guaranty fund of $10,000, the amount which it had placed in the Kansas State Bank which subsequently became insolvent.  The Kansas State Bank was operated under the bank guaranty law, and the plaintiff claims that the amount which it placed in that bank was a deposit within the meaning of that law and is eligible to guaranty under its provisions.

It appears that the deposit was secured through the action of Earl G. Eberhardt and Ray C. Noonan, agents of a life insurance company, who had a reciprocal arrangement with a number of banks by which they solicited and obtained deposits for the banks, in return for which the officers of the banks were to aid the agents in securing applications for life insurance in their company.  In February, 1919, these agents called upon J. E. Griest, the secretary-treasurer of the trust company, and exhibited to him a list of banks for which they were soliciting deposits.  They proposed to him the making of a deposit in the Kansas State Bank, and Griest remarked that he would examine into the condition of the bank and advise them later as to what action would be taken.  After making the examination he told them that the bank appeared to be all right. A deposit of $10,000 was arranged for by plaintiff passing $10,000 to the credit of the Kansas State Bank, upon which plaintiff was to receive interest on the certificate at the rate of four per cent, a rate authorized by the bank commissioner, and the agents agreed to pay plaintiff a bonus of $100 which, if added to the interest upon a six months' certificate, would be the equivalent of six per cent.

There was a further understanding between them that the Kansas

State Bank should keep with plaintiff approximately $2,500 during the life of the certificate, and that plaintiff would pay the Kansas State Bank three per cent on the average daily balances on the deposit placed with plaintiff. The insurance agents were not agents of the bank nor employed by it to solicit deposits but secured this one for the reciprocal benefits expected to result from the influence of the officers in helping them to obtain applications for insurance. They solicited and secured deposits by the trust company in other banks on like terms upon which certificates were issued, and the payment of the $100 by them to bring the returns up to the equivalent of six per cent was likewise made in the hope that the officers of the bank would aid in bringing them new insurance business. The trust company was looking for new business connections and hoped by making the deposit with the bank to obtain a reciprocal deposit and open business relations with a new concern which would prove mutually advantageous. The insurance agents procured the bank to issue a certificate of deposit for $10,000 at four per cent and sent it to the trust company, and with it a cashier's check for $100 which was taken out of their individual funds. When these were received by the trust company the certificate was returned to the bank with the information that it must come directly from the bank. Thereupon the assistant cashier of the bank telephoned Griest that the bank had regarded the transaction as closed, that it had already drawn drafts against the deposit and the bank would be embarrassed if the drafts were dishonored. F. J. Harper, a bank examiner, happened to be in the bank at the time of the telephone interview, and was engaged in checking up the bank. The cashier called him to the phone and he had an interview with Griest and told the latter that things were regular in the bank and he saw no reason why the transaction should not be completed. Griest then asked the cashier to send him a statement of the bank's condition and if it proved to be satisfactory the transaction would be carried out. Immediately afterwards Griest called the bank commissioner's office on the telephone and had a conversation with the assistant commissioner, asking him as to the identity of the examiner who was checking up the bank and with whom he had had a telephone interview, and also asked if the bank was operating under the bank guaranty law. The assistant commissioner responded that Harper was the name of the examiner who was in Salina checking up the bank, and that the Kansas State Bank was

being operated under the bank guaranty law. A statement of the bank's condition was received by plaintiff on March 6, 1919, and immediately afterwards a credit slip for $10,000 was issued and forwarded to and received by the bank on March 7. In the communication attention was called to the arrangement that the bank was to maintain a deposit of at least $2,500 with the trust company, and he incidentally spoke of the transaction as a loan. On March 7 the plaintiff paid a draft drawn upon it by the bank for $5,000 and later on the same day another draft for $2,500 was presented and paid. Sometime before May 1, 1919, the bank notified the trust company that it desired to draw out the remaining $2,500 of the deposit, but the plaintiff objected to this course and called attention to the agreement that $2,500 should be deposited with plaintiff during the time it held the certificate of deposit, and that if the bank desired to make any change plaintiff would prefer to have the bank take up the certificate and close the account. On May 17, 1919, plaintiff received a telegram from the National Bank of Commerce asking if it would pay a draft of the Kansas State Bank for $2,500. On the same day plaintiff replied by telegram asking the date, amount and payee of the draft mentioned. A telegram was sent by the National Bank of Commerce giving the requested information. The trust company then responded with another telegram saying that the Kansas State Bank had a sufficient balance with plaintiff to take care of the $2,500 and that it would honor the draft if the balance with the trust company was sufficient when it was presented. The draft was presented to and paid by the trust company on May 18. The certificate issued to plaintiff was regularly registered in a record book of the bank kept for that purpose with the approval of the bank commissioner, and was carried there as a deposit eligible to guaranty, upon which assessments were made in accordance with the bank guaranty law. After the bank became insolvent a demand was made upon the bank commissioner to issue a certificate on the bank guaranty fund, but he declined to issue it on the ground that the trust company had received a rate of interest in excess of four per cent, and the advancement of the $100 by the insurance agents to bring the rate of the trust company equal to six per cent. He reserved the right to make other objections, and one of those which he has since urged is the agreement that the bank should maintain a deposit with the trust company of $2,500 during the life of the certificate of deposit. The commis-

sioner appointed to take the testimony after finding the facts, stated the following conclusions:

"A bank or trust company may be a depositor within the meaning of the bank guaranty law, and the deposits may be made as well by placing it at the disposal of the depositary as by the actual physical delivery of the currency to it. Such is the interpretation placed upon the law by the state bank commissioner's department, and while such interpretation does not affect the liability of the depositors' guaranty fund, it is correct.

"The characterization of a transaction by the parties to it, either during its consummation or afterwards, as a loan, investment or deposit, is not controlling.

"The agreement to maintain a balance of approximately $2,500 of the fund with plaintiff during the life of the certificate did not convert the transaction into a loan, nor was it 'security' within the meaning of the bank guaranty law, nor did it render the transaction illegal. It was nothing more than an arrangement for a reciprocal deposit.

"The payment of a bonus by Eberhardt violated no law and did not render the transaction a loan.

"The transaction described in the findings of fact was a deposit eligible to guaranty and was not a loan."

There is no serious complaint of the findings of fact but. defendant challenges the correctness of the conclusions of law made by the commissioner. It is insisted that under the facts found the transaction between the bank and the trust company was in fact a loan and that in any view it was not a deposit within the meaning of the guaranty law. One of the grounds for the contention is the payment of a bonus of $100 by the insurance agents who solicited and secured the deposit. In the present case the $10,000 represented by the certificate given to plaintiff was received and used by the bank and the rate of interest named in the certificate was the approved rate of four per cent. It is contended that the payment of the bonus was made for the use and benefit of the bank and that the acceptance of the same by plaintiff made it an unlawful transaction which takes it outside of the protection of the guaranty law. In that act there is a provision that if a bank officer shall pay interest on a deposit in excess of the uniform rate fixed and approved by the bank commissioner, it shall be deemed reckless banking for which he may be removed from office and the bank shall be disqualified to participate in the benefits of the act. (Gen. Stat. 1915, § 601.) The approved rate of interest at the time of this transaction was four per cent, and as we have seen that was the rate named in the certificate which the bank issued to plaintiff. It has been found upon

sufficient evidence, and we approve the finding, that the insurance agents who solicited the deposit were not the agents of the bank. They paid the bonus from their own funds. By soliciting and securing the deposits they hoped and expected to obtain new insurance business, but this had not been done under employment by the bank, and they were not agents of the bank at any time during the transaction. The bonus was paid not for the benefit of the bank, but was advanced by the solicitors for their own benefit. The soliciting of deposits has become a common practice among banks, and the fact that a deposit has been solicited does not give it the character of a loan nor deprive it of the protection of the act. In *State Bank v. Bank Commissioner*, ante, p. 520, it was said:

"That a deposit is made in response to active and personal solicitation is not enough to convert it into a loan, that being a recognized method of increasing deposits. Nor is the mere fact that certificates of deposit are drawn and signed before an agreement to take them has been made." (p. 527.)

These circumstances in connection with others tending to show a borrowing of money might characterize a transaction as a loan, but of themselves and where the bonus is paid by a third party they do not.

A different rule would apply if the bank had issued a certificate bearing a higher rate of interest than the maximum allowed by the bank commissioner or the bank itself had paid a bonus to obtain a deposit that would increase the rate of interest beyond that authorized to be paid. Here the bank had no connection with the bonus. It gained no advantage and suffered no detriment from its payment, its obligation on the certificate was not increased by the payment, and the full amount named in the certificate was received and used by it in its current business. If the soliciting of deposits by banks, which is always attended by some expense, is legal, surely an expenditure by an outsider in securing a deposit in which the bank had no part, in order to promote a purpose of his own, does not convert a deposit into a loan or taint a certificate otherwise legally issued. In the course of the trial the commissioner asked this question:

"Suppose I have $10,000. It is in my power to deposit it in any bank which I may select. A friend of mine knows that I have the money. He wants to borrow money. He goes to a banker in my town of Concordia. The banker says to him, 'Mr. Hunt has a considerable amount of money which he is prepared to deposit somewhere. If you will get a deposit from him of eight or ten thousand dollars, I will loan you a thousand dollars.' My friend

comes to me and offers to pay me one hundred dollars if I will deposit $10,000 in the bank from which he has a prospect of borrowing money. I deposit my money in the designated bank. Now, do you say that that is not a legal deposit within the meaning of the guaranty act?"

It would hardly seem that such a deposit could be regarded as illegal and unprotected, but in the supposed transaction there is the feature that the bank held out the inducement and agreed that it would make a loan to the soliciting party if he secured the deposit— an element that is absent in the case under consideration. We conclude that under the circumstances the payment of a bonus by the insurance agents did not make the transaction a loan nor operate to deprive the plaintiff of the protection of the guaranty fund.

Another contention of the defendant is that the agreement of the bank to leave a balance or to maintain a deposit with plaintiff during the life of the certificate makes the transaction something other than a deposit and prevents the money placed in the bank from being a liability against the guaranty fund. According to the testimony and findings the plaintiff was endeavoring to extend its business connections by making deposits of its surplus funds in banks and in this instance as in others it sought to open up new business relations that would be mutually advantageous. The understanding that the bank should maintain business relations with the plaintiff and keep a deposit with it is not an uncommon transaction among banking institutions. The arrangement contemplated that the deposit would be of a shifting amount as the bank was to pay three per cent on the average daily balances. Upon the issuance of the certificate the amount of it was placed by the plaintiff to the credit of the bank and a credit slip for the whole amount was sent to the bank. Seven thousand five hundred dollars of the deposit was immediately drawn and shortly afterwards a draft for the remainder was issued and paid. While some objection was made by plaintiff that the bank was not carrying out the understanding for maintaining the reciprocal deposit it appears that the plaintiff recognized that the remainder of the deposit belonged to the bank, and when the draft was drawn it was paid. The character of the negotiations concerning the leaving of approximately $2,500 on deposit with the plaintiff, including its use in its letters of the words "arrangement" and "understanding" in referring to that feature of the transaction, seem fairly open to the view that what

was said about that matter was not intended to create an absolutely binding obligation on the subject. The fact that, although the plaintiff made to the cashier of the Kansas State Bank an objection to paying out the last $2,500 of the deposit, its executive board decided that the fund was subject to withdrawal and that there was no legal reason for refusing the draft against it, and acted upon the decision, may be considered a practical construction given to their contract by the parties. When the plaintiff placed $10,000 to the credit of the bank a deposit was in fact made. In *State Bank v. Bank Commissioner*, supra, it was said:

"A deposit which will be protected by the state guaranty fund may be accomplished by giving the bank credit in another bank in exchange for a certificate of deposit." (Syl. ¶ 1.)

In *National Bank v. Bank Commissioner*, ante, p. 380, there was a further discussion as to the essentials of a deposit, and it was said:

"Money left with a bank, subject to order of the person leaving it, is a deposit. A deposit may be accomplished by taking credit on the books of the bank for a discounted note, or even by some obligatory arrangement with the bank for credit. In creating a deposit, pure formalities may be dispensed with, such as taking money across the counter on a matured certificate of deposit, and passing it back to obtain a new certificate." (p. 389.)

The bank was given credit for the whole amount in exchange for the certificate of deposit. The arrangement for reciprocal deposits was something aside from the obligation of the certificate, and that this was the understanding is made to appear by the payment of the money when the draft was presented. It was an arrangement for an interchange of business between plaintiff and the bank. When one bank deposits money in another the depositor has a right to expect that one receiving the deposit shall recognize the business relation and do part of its business with the depositing bank. Such interchange of business is a general practice among banking institutions, and it would be a harsh rule to hold that a deposit made where such an arrangement existed would be illegal and outside the protection of the guaranty law. Ordinarily when a business man deposits in a bank funds for which he has no present use, it is with the mutual understanding that the bank will in the future take care of him and make reasonable provision for furnishing money to carry on his business. A mutual understanding of that kind could hardly be held to impair the validity of a certificate of deposit issued by the bank to the busi-

ness man. The deposits excluded from the protection of the guaranty fund are expressly mentioned in the act. It provides that—

"All deposits not otherwise secured shall be guaranteed by this act. The guaranty as provided for in this act shall not apply to a bank's obligation as endorser upon bills rediscounted, nor to bills payable, nor to money borrowed from its correspondents or others." (Gen. Stat. 1915, § 600.)

The transaction in question has none of the excepted features mentioned in the statute. The deposit was not otherwise secured, it was not an obligation of the bank as endorser on rediscounted bills, was not a bill payable and has not the characteristics of borrowed money.

It was the manifest intention of the legislature that all good faith deposits not excluded by the terms of the act should be within its protection. The purpose of the act was not only to afford protection to depositors, but it was evidently the intention to provide such a guaranty as would induce the holders of money who kept it in their pockets to deposit it in banks and in that way increase the money available for general use, thus stimulating business and enabling the banks to give more efficient service to the communities in which they were located. Another consideration was that the liability assumed by the banks operating under the act would lead them to give closer attention to the condition of the banks associated with them and induce them to furnish the banking department information of any irregularities or reckless banking by their neighboring banks. The act should be interpreted in the light of the manifest purposes of the legislature; and an important one was to protect all *bona fide* deposits not otherwise secured. That purpose would be defeated if slight irregularities or mere informalities should be held to take the certificates issued to depositors out of the guaranteed protection. None of the grounds relied on by the defendant appear to be sufficient to deprive the plaintiff of the protection of the act. The plaintiff's claim differs materially from those of the claimants on the guaranty fund in the cases already cited. In one case the claimed deposit was otherwise secured, an excess rate of interest was agreed to be paid, the bank only received a part of the money for which the certificate was issued, and the claimant knew that the bank was financially embarrassed when the certificate was issued. (*State Bank v. Bank Commissioner,* supra.) In the other cases the transactions in connection with the issuance of the certificate were not bank transactions,

but the certificates were issued to take up personal obligations of certain promoters and had no deposit of money or money equivalent behind them and the payees of the certificate knew that they had been issued in payment of a private debt. (*National Bank v. Bank Commissioner*, supra.) In plaintiff's case the entire amount of money represented in the certificate was actually deposited in and used by the bank. Although the bank was financially embarrassed at the time of the transaction, the plaintiff had no knowledge of its condition. An officer of the plaintiff took pains to inquire and was assured by a bank examiner, who chanced to be in the bank when the inquiry was made, that the bank was regular and there was no reason why the proposed transaction should not be carried out. The officer of the plaintiff pursued the inquiry farther and took the precaution to call up the bank commissioner's office for further information and was told the name of the examiner representing the banking department who had given assurances to the plaintiff as to the condition of the bank, and was also informed that the bank was operating under the guaranty law. Upon this information and the bank statement showing the bank to be in a solvent condition, the plaintiff made the deposit and received the certificate, believing the bank was solvent and the deposit within the protection of the bank guaranty law.

Holding that the money placed in the bank by plaintiff is a guaranteed deposit, judgment as prayed for must go in favor of the plaintiff.

MARSHALL, J., heard the argument in this case but does not take part in the decision.

BURCH, J. (dissenting): In my opinion, the facts stated in the first paragraph of the syllabus as the basis for the conclusion of law, are not the facts on which the decision depends, and the inference of fact stated in the second paragraph of the syllabus as the basis for the conclusion of law, is not warranted by the facts.

The transaction resulting in issuance of the certificate embraced two conditions imposed by the plaintiff: First, the plaintiff should have six per cent interest on its money; and second, the bank should leave with the plaintiff twenty-five per cent of the amount of the certificate until it matured. The term "bonus" was not used in the negotiations which resulted in issuance of the certificate. It was brought into the record by the attorneys. Eberhardt and Noonan

conducted the negotiations which led to issuance of the certificate. They had with them a list of banks, which included the Salina bank, and they afterwards marketed to the plaintiff paper of some of the other banks. Eberhardt testified as follows:

"Q. Who was it first suggested that there should be a bonus of one hundred dollars paid? A. Why, the understanding that we had, that any paper they bought had to net 6 per cent.

"Q. That is your understanding here with the trust company? A. Yes, sir. And those CD's drew 4 per cent, so we had to pay the additional amount to make the 6 per cent.

"Q. To bring it up to 6 per cent? A. Yes, sir.

"Q. And that is the reason of this check of $100? A. That is the reason I sent that one-hundred-dollar check; yes.

"Q. Now, you talked with them, not only about the Kansas State Bank, but about these other banks? A. Yes, sir.

"Q. And after your conversation with Mr. Slaughter and Mr. Griest and Mr. Collingwood—or rather, during your conversation—you were told that any arrangement that you made here by which they handled paper for any of these banks, would have to net them 6 per cent? A. Yes, sir.

"Q. So when you obtained a CD from the Salina State Bank you understood, if you handled it here, you would have to increase it to 6 per cent, did you? A. Yes, sir.

"Q. And the one hundred dollars was paid in order that the CD might be negotiated? A. Yes, sir.

"Q. That is 2 per cent interest in addition to the 4 per cent? A. What is that?

"Q. The hundred dollars, then, represented 2 per cent interest on ten thousand dollars for six months? A. Six months; yes, sir.

"Q. Did you make an arrangement with the trust company here for any of the other banks? A. That day we had a list of banks, and we asked them if it would be all right if we secured them.

"Q. Yes, sir. A. And later on we got two more banks for them.

"Q. What banks did you get? A. We got the Solomon National, and I think it is the Farmers State at Beloit that we got.

"Q. And were CD's issued for those two banks? A. Yes, sir.

"Q. You had the Farmers State at Oakley? A. I think it was the Farmers State at Oakley; yes, sir.

"Q. Those CD's brought 4 per cent, the same as the others? A. Yes.

"Q. And in negotiating them here with the trust company you had to make them equal to 6 per cent paper, did you? A. Yes, sir.

"Q. And did so? A. He did; yes.

"Q. And the same arrangement of at least 25 per cent must remain on deposit? A. Yes, sir.

.   .   .   .   .   .   .   .   .   .   .   .   .

"Q. It was definitely understood, however, that 25 per cent should remain for the full period of six months? A. That was the agreement that was made.

"Q. That was the agreement that was made? A. Yes, sir.

"Q. That was not reduced to writing, that agreement was not? A. No, sir.

"Q. Then you could not have, as you understood it—you could not have negotiated this CD for the Kansas State Bank without paying that one hundred dollars? A. That was the understanding.

"Q. Yes. A. And keeping the 25 per cent agreed to.

"Q. But after your preliminary conversation here, you then went to the Kansas State Bank at Salina and suggested to them that they might obtain— or might open negotiations here? A. Yes, sir.

"Q. And you told them at that time that if they would issue a CD for ten thousand dollars, you could have that passed to their credit on the books here, on the conditions that you have named? A. Yes, sir.

"Q. And one of which was that they must maintain here at least 25 per cent of their balance? A. Yes.

"Q. During the life of the CD's? A. Yes."

J. E. Griest, secretary and treasurer of the plaintiff, testified as follows:

"Q. State to the commissioner what the terms were of the arrangement. A. Well, we were to get the regular percentage from the bank on deposits that we required, the same as all other correspondents. This arrangement included opening an account in the trust company. They were to keep a balance of approximately 25 per cent of the amount, at least, of this certificate of deposit here.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Were you looking for a depositary at that time? A. We were in the bank correspondent business.

"Q. Were you looking for chances to deposit money in some new bank? A. Yes.

"Q. You were? A. Yes, sir.

"Q. You were looking for an opportunity to deposit ten thousand dollars? A. To invest money, or have them take it on.

"Q. To invest money? A. Yes, or its equivalent."

When the transaction was closed, Mr. Griest wrote the cashier of the Salina State Bank as follows:

"Herewith credit slip for the $10,000 certificate of deposit received yesterday. Would like to have you understand that an arrangement is made to maintain at least a 25 per cent reserve while this loan is made to you."

J. H. Collingwood, vice president of the plaintiff, testified as follows:

"We made deposits at Eberhardt's and Noonan's solicitations, in different banks; I think one at Solomon, and I believe one at Oakley, and I think there was one at Wilson, Kansas. I am not sure that we required the paper to be brought to 6 per cent, but I think we did in every case.

"Q. You had a surplus there? A. We wanted to have a better rate for it. You understand when it is deposited in banks such as we deposited that in the

Mortgage Trust Co. v. Bank Commissioner.

bank at Salina, and accept CD's, it isn't eligible for reserve; it is a time deposit, and not subject to check.

"Q. And it is not a part of the reserve? A. Yes, and we had more money than we could use in our business.

"Q. And wanted to get it out? A. And wanted to get it out earning money for us.

"Q. And get it out at a high rate as possible? A. Exactly.

"Q. And the converse of that is true—and a bank needing money frequently gives one of its CD's that way so they can borrow money? A. I think it is generally done, although I have never done it with any of my banks. I never put out CD's for that purpose, but I am confident it is done in some cases.

"Q. And what they were doing here? A. And apparently what they were doing here."

Commissioner Hunt returned the following finding of fact:

"Sometime prior to May, 1919, there was some communication from the Kansas State Bank, the nature of which is not disclosed by the evidence, but was an indication that the bank desired to withdraw the remaining $2,500. The plaintiff objected to its withdrawal because of the arrangement that approximately $2,500 was to remain in its hands, and the plaintiff wrote to the Kansas State Bank the following letter:

"'Referring to your telephone conversation to-day with reference to the $10,000 CD issued to this company with the understanding that you were to retain a balance of $2,500 in this trust company during the time the CD was held by us: We shall expect you to keep your agreement in this respect. In case you desire to make any change, we prefer to have you take up the CD and close the account.'"

Cutting through forms, disregarding afterthoughts, and going directly to the substance of the transaction, it seems clear to me the plaintiff loaned the bank $10,000, at six per cent interest, on a certificate of deposit bearing four per cent interest, secured by retention of twenty-five per cent of the principal sum. The remaining two per cent interest was taken in advance in cash. The two per cent interest paid by Eberhardt was no more a bonus to the plaintiff than the four per cent interest recited in the certificate was a bonus to be paid to the plaintiff by the borrowing bank. The plaintiff required six per cent interest on its money, and the requirement was met. The agreement for the security was as definite as any other feature of the transaction. While a varying daily balance was contemplated, on which interest was to be paid, the balance was not to fall below $2,500 at any time during life of the certificate. Lefferdink needed all the money he had borrowed, and of course he disregarded the agreement. The plaintiff might have refused to pay the

last draft without incurring any liability. That it chose to yield to Lefferdink did not affect the original character of the transaction.

The opinion of the court speaks of a practical interpretation of the contract relating to retention of the $2,500, and there was such an interpretation. It occurred when Lefferdink, knowing the contract prohibited him from drawing the money, indicated he desired to do so, and the bank, having the same understanding of the matter, denied the request.

There was no "reciprocal deposit," and could be none, because of the agreement. Two thousand and five hundred dollars of the amount of the certificate was not subject to check or draft. The certificate was issued on that condition, and whether or not the condition was subsequently waived is immaterial.

In my opinion the writ should be denied.