No. 24,354.

THE BOARD OF COUNTY COMMISSIONERS OF BARBER COUNTY, *Plaintiff*, v. FRANKLIN H. FOSTER, (CARL J. PETERSON, substituted) Bank Commissioner, *Defendant*.

SYLLABUS BY THE COURT.

1. BANK GUARANTY FUND—*Certain County Deposits Not Within Protection of State Bank Guaranty Fund.* A deposit subject to check bearing interest in excess of a rate, uniform within the county, that has been approved by the bank commissioner, is not within the protection of the state bank guaranty fund.

2. SAME—*Bank Commissioner May Fix Maximum Interest Which Banks in Each County May Pay on Deposits—Statute Constitutional.* The statute authorizing the bank commissioner to fix a maximum rate of interest, uniform within each county, which banks may pay upon deposits to be permitted to participate in the benefits of the bank guaranty act, is not unconstitutional as an improper delegation of legislative power to an administrative officer.

Barber County v. Bank Commissioner.

3. SAME—*County Deposits Not State Deposits.* County deposits are not state deposits within the meaning of sections 10955 to 10972 of the General Statutes of 1915.

4. SAME—*Certain Bank Deposits Not Within the Protection of State Bank Guaranty Fund.* The fact that a county may designate a county depository and receive interest in excess of two per cent in accordance with section 2788, of the General Statutes of 1915, would not bring the deposit within the protection of the bank guaranty act if the rate received by the county is in excess of a rate, uniform within the county, that was approved by the bank commissioner.

Original proceeding in mandamus. Opinion filed March 10, 1923. Writ denied.

*Chester I. Long, Joseph D. Houston, Austin M. Cowan, Claude I. Depew, Forest D. Siefkin, James G. Norton,* all of Wichita; *Riley W. MacGregor,* county attorney, and *Adrian S. Houck,* of Medicine Lodge, for the plaintiff.

*Charles B. Griffith,* attorney-general, *John G. Egan,* assistant attorney-general, *J. B. Larimer, A. A. Godard, J. Arthur Myers, Robert Stone, George T. McDermott, Robert L. Webb, Beryl Johnson,* and *W. Glenn Hamilton,* all of Topeka, for the defendant.

The opinion of the court was delivered by

HARVEY, J.: This is an original proceeding in mandamus, to compel the state bank commissioner to issue a certificate against the state bank guaranty fund for $90,656.80, being the amount of the deposit of Barber county in the Lake State Bank at the time of its failure in November, 1921. Defendant contends that the writ should not be issued for two reasons: first, that the deposit was "otherwise secured" within the meaning of the bank guaranty law, and, second, that the rate of interest paid by the bank upon the deposit was larger than that approved by the state bank commissioner. The testimony was taken before a commissioner appointed by this court and he has made findings of fact and conclusions of law and recommends that the writ be allowed. The plaintiff moves for judgment in its favor upon the findings of the commissioner, while the defendant moves to set aside certain of the findings of the commissioner as not being supported by the evidence, and for judgment.

There is not much controversy about the facts. The Lake State Bank, situated at Lake City, about eighteen miles from Medicine Lodge, the county seat of Barber county, was operating under the bank guaranty law. The First National Bank at Medicine Lodge

was the designated depository of the county funds and was paying three per cent interest to the county upon the daily balances of that fund. At the February, 1919, meeting of the board of county commissioners of Barber county, Dave Freemyer, president of the Lake State Bank, and others associated with him, appeared and wanted the Lake State Bank to be designated as county depository and offered to pay more interest than the county was then receiving. In some way the officials of the First National Bank learned, or were notified, of this action, and appeared at the board meeting. There was quite a spirited bidding as to the interest rates by the representatives of the two banks, with the result that the Lake State Bank, having offered to pay 4¼ per cent interest on daily balances, its offer was accepted and the following entry made in the commissioners' journal of that day, February 3: "A motion was made, seconded and carried that the offer of 4¼ per cent on daily balances, for county money, submitted by the Lake State Bank, be accepted for a term of two years." Though the commissioners did not demand or require a bond to secure the deposit, it appears that something was said about such a bond and Mr. Freemyer offered to furnish either a personal or a surety bond to secure the deposit. Such a bond in the sum of $600,000 was prepared, signed by the Lake State Bank as principal and various individuals as sureties, and presented to and approved by the county commissioners the next day and the following entry made in the commissioners' journal of February 4: "Moved, seconded and carried that The Lake State Bank be designated as the county depository for the term of two years and that the bond submitted by them be accepted." Soon thereafter the county funds were withdrawn from the First National Bank of Medicine Lodge and deposited in the Lake State Bank, which bank continued to be the county depository until it failed, November 23, 1921, and during all of that time paid interest to the county upon the daily balances of its deposits at the rate of 4¼ per cent per annum. This deposit was subject to check, and during the time the county deposited more than a million dollars in the account, and drew checks thereon, leaving a balance of $90,656.80, at the time the bank was closed. The Lake State Bank included the Barber county deposit in its report to the bank commissioner of deposits subject to assessment for the guaranty fund. The Lake State Bank had some private arrangement with the Home State Bank of Medicine Lodge by which the

county officials made the deposits from day to day in the Home State Bank, for the use of the Lake State Bank, but that appears to be a detail which has no direct bearing in this case. At the April, 1921, meeting of the board of county commissioners the Lake State Bank was continued as the depository for the county funds to February, 1922, for moneys received by the county prior to the taxes of 1921, other banks being named in which to deposit the 1921 taxes, but this change in arrangement has no special significance in this case.

Originally the guaranty fund protected only deposits not bearing interest and time certificates bearing not more than three per cent. (Gen. Stat. 1909, § 542.) This was amended in 1911, so as to read: "All deposits not otherwise secured shall be guaranteed by this act" (Gen. Stat. 1915, § 600), and at the same time the succeeding section was so amended as to provide that: "Any officer of any bank who shall pay interest on different terms or in excess of a rate (which rate shall be uniform within each county) that shall be approved by the bank commissioner from time to time, on any form of deposits, . . . shall be deemed to be reckless and may be removed from office, . . . and such bank shall not be permitted to participate in the benefits of this act." The effect of the amended statute is not to admit deposits to participate in the guaranty fund, if interest is paid on the deposit in excess of a rate approved by the bank commissioner (*State Bank v. Bank Commissioner*, 110 Kan. 520, 204 Pac. 709), and any such rate approved by him must be uniform as to all the banks doing business in a county.

Following the amendments of 1911 to the guaranty law, above noted, the then bank commissioner issued an order, effective March 14, 1911, prescribing three per cent as the maximum rate of interest under the bank guaranty law, and an order, effective March 15, 1911, prescribing the maximum rate of interest at four per cent per annum on time certificates payable in not less than three months nor more than two years. On April 1, 1915, the then bank commissioner issued the following order:

*"To the Managing Officer of the Bank Addressed:*

. "In accordance with the provisions of section 7 of the bank depositors' guaranty law of Kansas, the following ruling is made:

"Supplementing department letter of March 15, 1911, and subsequent letters, effective April 15, 1915, the following interest rates are hereby approved:

"A maximum rate of 4% on time certificates of deposits, not payable in less than three months, and not extending for more than two years, and having

a definite date of maturity, when interest shall cease. No interest to be paid for periods shorter than three months.

"It is recommended, however, that 3% is as high as should be paid in most Kansas counties at this time. The *maximum* rate of 3% per annum, heretofore approved, applies *to all other forms of deposits* except state deposits, which are regulated by special legislation.

"This ruling will apply to every state bank under the jurisdiction of this department, and shall be uniform in every county in Kansas."

On August 1, 1921, the then bank commissioner issued an order "covering all forms of interest-bearing obligations assumed by any state bank of Kansas," which, so far as pertinent here, reads as follows: "(2) . . . On all accounts subject to check . . . the maximum rate which may be paid is three per cent," and on September 1, 1921, the order of August 1, 1921, was modified, but in a way so as not to change the rate to be paid on deposits subject to check. These appear to be the only general orders issued by the various bank commissioners upon the subject.

A short time prior to February 4, 1919, Dave Freemyer, president of the Lake State Bank, had a conversation with Walter B. Wilson, then bank commissioner, in which he complained of the inability of his bank and other state banks in Barber county, to meet the competition of the First National Bank in bidding for county money. At this time Mr. Wilson was under the erroneous impression that the First National Bank was paying three and one-half per cent on average daily balances, and he gave Mr. Freemyer to understand that it would be proper for the state banks in Barber county to bid such amount as was reasonable to secure the deposit of county funds, although he did not fix any maximum rate of interest which the state banks should pay.

No written order was made by the bank commissioner concerning the matter of this conversation, nor was any record of any kind made of it in his office, and it appears that no word concerning it was sent to any of the other banks in Barber county. A confidential report of the Lake State Bank to the bank commissioner, made by one of his bank examiners who examined the bank as of March 31, 1919, contained the following statement:

"Bank was recently in competition with the First National Bank of Medicine Lodge and others for the county money. They made a bid of 4 1-2% for all the funds and got it. Mr. Freemyer claims he had the entire approval of the Dept. in the amount of interest allowed."

This report was personally examined by the bank commissioner,

but he made no exception to the report, nor did he notify Freemyer that his statement to the bank examiner was erroneous. The statements made by the bank to the bank commissioner from time to time showed that the bank was paying 4¼ per cent on this deposit, as did the several reports of the bank examiners made to the bank commissioner. No written order was made by the bank commissioner fixing a rate of 4¼ per cent to be paid on deposits of county funds, or deposits subject to check, in Barber county, or permitting the payment of interest in excess of 3 per cent on such deposits. On September 27, 1921, the bank commissioner notified the plaintiff that interest in excess of 3 per cent was illegal and would not be permitted by the department. On March 22, 1921, Mr. Freemeyer wrote the bank commissioner as follows:

"At the time we secured the Barber county deposit of county money, we bid in competition with a National Bank, who bid 4¼% for the county funds, and the county commissioners let us have the county funds at the National Bank's bid of 4¼%."

The letter then asked if it was necessary to give a bond to secure these funds, "also if this county deposit is protected by the guarantee." The bank commissioner replied referring him to certain sections of the statute about the bond, but did not answer the question as to the county deposit being protected by the guaranty law.

The evidence showed that on a few occasions where national banks were paying 5 per cent on time certificates of deposit, the bank commissioner had authorized the state bank in the same town or county to pay the same rate on the same class of deposit, and this approval was sometimes verbal and sometimes in writing.

The above recital of facts are taken largely from the findings of facts made by the commissioner who took the testimony. Where they differ, the findings of the commissioner may be regarded as set aside.

The commissioner found as a conclusion of law:

"2. The action of the bank commissioner concerning the Barber county deposit was the legal equivalent of an approval by him within the meaning of the bank guaranty law, of a rate of 4¼% uniform in Barber county on county funds."

This does not meet our approval. The written orders of the several bank commissioners since March, 1911, each fixed the maximum rate approved on deposits subject to check at 3 per cent, and that of August 1, 1915, which was the last general order concerning that

matter prior to the beginning of this deposit in February, 1919, specifically provided that it should be "uniform in every county in the state." The only claimed modification of that so far as Barber county was concerned, prior to February, 1919, was the conversation between Freemyer and the bank commissioner, Mr. Wilson. At this time Mr. Wilson was under the erroneous impression (probably furnished him by Freemyer), that the First National Bank was paying 3½ per cent on daily balances. The bank commissioner told Mr. Freemyer "If I were running a state bank in that county I would bid for it." There was some talk about what had been done at Stafford, or some other place, about a state bank being permitted to meet a national bank rate on a time certificate. Nothing was said about the guaranty fund, or whether the deposit with a higher rate would be protected by the guaranty fund; nothing was said about notice of any change in rate to the other state banks in Barber county. The bank commissioner was not asked to approve any specific rate, and did not do so, and certainly did not approve a higher rate than 3 per cent "uniform within the county." Freemyer did not specifically report this to the bank commissioner for more than two years—until his letter of March, 1921—and then he asked if the deposit was under the protection of the guaranty law, which shows conclusively that he had no understanding with the bank commissioner that he could pay 4¼ per cent on a checking deposit, with the approval of the bank commissioner, as that term applies to the bank guaranty law. With much less reason can it be said that the bank commissioner approved such a rate "uniform within the county." True, the bank commissioner learned of this deposit, and of the rate paid, by a confidential letter from his examiner and from the regular reports which came to his office, and said nothing concerning them, but that is not such approval as is contemplated by the statute. If that were an approval at all, it was one in violation of the words and the purpose of the statute. The statute contemplates an approval of a rate upon deposits of some readily defined class, as "deposits subject to check," "unsecured deposits," "certificates of deposit" for a definite time, "savings deposits," etc. The statute also specifically contemplates that such approved rates shall be uniform within a county, that is, that every state bank in a county shall be informed of the approved rate, so the state banks of a county shall have equal knowledge and opportunity. The bank commissioner cannot bind the guaranty fund by sitting mute. Had

he written Freemyer, immediately on learning of this deposit, by the confidential letter of March 31, 1919, that the deposit was protected by the guaranty fund, it would not then have bound the fund. In *State Bank v. Bank Commissioner,* 110 Kan. 520, 204 Pac. 709, it is said:

"Bank Commissioner Wilson did undertake to assure Crummer that the certificates of deposit would be within its protection, but that was merely the expression of opinion on a matter of law. The bank commissioner could not by contract make the fund liable; the matter of liability was determined by the statute." (p. 530.)

It is true that in February, 1921, and in April, 1921, representatives of other state banks, and of the two national banks, in Barber county, met with the county commissioners and requested that the county funds be deposited among the various banks doing business in the county, and at the April meeting an order was entered designating one of the banks at Medicine Lodge as the bank of deposit, the funds to be deposited through it to other banks in the county, in proportion to their capital and surplus, desiring to participate in the deposit, the interest rate to be 4¼ per cent and the deposits to begin with the taxes of 1921, payable in November of that year, but the findings do not show that this arrangement ever came to the knowledge of the bank commissioner, nor that it was approved by him. The findings do show that the bank commissioner, by his order of August 1, 1921, setting aside all former orders, and by his order of September 1, 1921, fixed the maximum rate to be paid on deposits subject to check at 3 per cent. The findings further show that the bank commissioner specifically notified the plaintiff September 27, 1921, that the rate in excess of 3 per cent was illegal and would not be allowed. Yet in the face of these orders, and this special notice, the Lake State Bank continued to pay, and the plaintiff continued to receive, 4¼ per cent upon this deposit until the bank closed its doors, November 23, 1921.

The principle that a deposit bearing a rate of interest in excess of that approved by the bank commissioner is not protected by the bank guaranty fund is not new in this court. It has been uniformly applied and made the basis of the decision of the court when appropriate. (*National Bank v. Bank Commissioner,* 110 Kan. 380, 204 Pac. 715; *State Bank v. Bank Commissioner,* 110 Kan. 520, 204 Pac. 709; *Mortgage Trust Co. v. Bank Commissioner,* 110 Kan. 786,

205 Pac. 610; *Bank v. Bank Commissioner,* 112 Kan. 141, 210 Pac. 490.)

The conclusion seems irresistible that the rate paid was in excess of a rate, uniform in the county, that had been approved by the bank commissioner, and the deposit therefore is not protected by the bank guaranty law.

A few other matters should be mentioned. Plaintiff maintains:

"The statute authorizing the bank commissioner to fix a rate of interest is unconstitutional and invalid, as a delegation of legislative power to an administrative officer."

The business of banking is so intimately connected with the public welfare that it is subject to legislative regulation, under the police power of the state, and the legislature has ample authority to empower administrative boards or officers to make reasonable rules and regulations in relation thereto. So often has this been decided that a reference to a few of the cases will be deemed sufficient. (*Schaake v. Dolley,* 85 Kan. 598, 118 Pac. 80; *Engle v. O'Malley,* 219 U. S. 128, 55 L. Ed. 128; *First National Bank v. Union Trust Co.,* 244 U. S. 416; *McKinley v. United States,* 249 U. S. 397; *Insurance Co. v. Lewis,* 233 U. S. 389; *Arven v. United States,* 245 U. S. 366.)

We have examined all of the cases cited by plaintiff upon this point. Those which at first glance appear to oppose this principle apply to city ordinances, or to private associations, or for some other obvious reason are not in point. It will not be necessary to analyze them in detail.

Plaintiff further claims that the order fixing the rate of interest was never legally published, and even if a statute authorizing the bank commissioner to fix a rate is valid, the exercise of it by the bank commissioner in this case is unreasonable and results in the taking of plaintiff's property without due process of law and deprives plaintiff of a fair hearing.

The statute does not prescribe any specific method of publication. All the general orders of the several bank commissioners were sent to every state bank and trust company in the state. No reason suggests itself why that is not sufficient. The only order not given publicity was the one, if made at all, by which plaintiff claims the bank commissioner approved a rate of 4¼ per cent for one deposit in one bank—the Lake State Bank. We agree there was no sufficient publicity given such approval, even if it can be said the approval

was obtained. In this connection see *Richards v. Coal Co.,* 104 Kan. 330, 179 Pac. 380.

A reasonable regulation for the transaction of banking business cannot be said to take the property of anyone without due process of law.

In *Engel v. O'Malley,* 219 U. S. 128, 55 L. Ed. 128, it was held:

"The possibility that the comptroller may refuse a license to a private banker upon his arbitrary whim does not invalidate, under U. S. Const., 14th Amend., the requirement of N. Y. Laws 1910, ch. 348, that a license from that official be obtained by individuals or partnerships desiring to engage in that business."

The order of the bank commissioner, approving the maximum rates of interest banks might pay on various classes of deposit and be within the benefits of the guaranty fund, did not apply to state deposits, because of particular statutes which govern the letting of those deposits and the kind of securities that shall be given therefor. (Gen. Stat. 1915, §§ 10955-10971.) Plaintiff contends that the Barber county deposit is a state deposit, and that the orders of the bank commissioner do not apply to it. We have examined this question and find no merit in it.

The statutes pertaining to county depositories, section 2788 of the General Statutes of 1915, provides, among other things, "Such bank or banks shall pay interest on the average daily balance at such rates as may be agreed upon, which rate shall not be less than two per cent per annum." Plaintiff contends that this statute is the one which governs the rate which may be paid by a depository for county funds, and, since the statute fixes a minimum, but no maximum, any rate agreed upon between the county and the depository, of two per cent or more, would be legal. Let it be conceded that the rate would be legal between the county and the depository, it does not necessarily follow that the deposit is protected by the guaranty fund. The bank guaranty law contemplates that deposits may be in a bank under such conditions as not to be protected by the guaranty fund, and also contemplates certain situations which would prohibit the bank from participating in the benefits of the guaranty fund act. (Gen. Stat. 1915, §§ 600, 601.) So, while the rate may be legal as between the county and the depository, the deposit will not be protected by the guaranty fund act unless it is within those classes of deposits which the guaranty fund act provides shall be protected by it.

With the view we have taken of this case, it is not necessary to consider whether this deposit was "otherwise secured." It is possible that persons not parties to this action should be heard upon that. Therefore we express no opinion as to whether the bond given at the time the Lake State Bank was designated county depository was void when given, or at any time. The findings and conclusions of the commissioner as to that bond are set aside, as not being necessary to the decision of this case, and in order that they may prejudice no one.

The application for the writ is denied.

HOPKINS, J., not sitting.