No. 26,695.

THE PEOPLES BANK OF DIXON, MISSOURI, *Plaintiff*, v. ROY BONE, as Bank Commissioner, etc., *Defendant*.

SYLLABUS BY THE COURT.

1. BANKS AND BANKING—*Depositors' Guaranty Fund—Bona Fide Deposits.* To determine whether a deposit has been made in a bank within the meaning of our bank guaranty law, the court will examine the entire transaction to ascertain the actual facts as to whether there was a *bona fide* deposit, and if not, the bank depositors' guaranty fund does not protect the transaction, no matter how it may be evidenced.

2. SAME—*Depositors' Guaranty Fund—Deposits Within Act.* A transaction examined, and held not to constitute a deposit within the meaning of the bank depositors' guaranty law.

Original proceeding in mandamus. Opinion filed November 6, 1926. Judgment for defendant.

*Clad Hamilton* and *Donald A. Campbell,* both of Topeka, for the plaintiff; *L. H. Breuer,* of Rolla, Mo., of counsel.

*Charles B. Griffith,* attorney-general, *John G. Egan* and *Roland Boynton,* assistant attorneys-general, for the defendant.

The opinion of the court was delivered by

HARVEY, J.: This is an original proceeding in mandamus to compel the bank commissioner to issue a certificate against the bank depositors' guaranty fund. The evidence was taken by deposition and has been abstracted. The case is before us for decision upon the facts as well as upon the law. The question to be determined is whether the transaction constituted a deposit subject to guaranty within the meaning of the bank guaranty law.

The facts, so far as it is necessary to consider them, are not seriously controverted, and are as follows:

The plaintiff is a state bank located at Dixon, Mo., a small town situated on the Frisco railroad in a farming and live-stock community about 250 miles southeast of Kansas City. Its principal correspondent banks are in St. Louis, East St. Louis and Kansas City. It carried no accounts with Kansas banks and transacted no business with them except an occasional collection item. In December, 1922, and January, 1923, its capital was $15,000, surplus $15,000, and although financially sound, it was in need of increasing its deposits.

Banks and Banking, 7 C. J. p. 485 n. 82.

Peoples Bank v. Bone.

It had outstanding time certificates of deposit bearing five per cent interest, and had $10,000 borrowed from a St. Louis bank on its demand note for which it was paying six per cent interest. Mr. C. F. Christeson was its cashier and active managing officer.

The Vernon State Bank was located at Vernon, Kan., a small town situated about 125 miles southwest of Kansas City. In December, 1922, it had a capital of $10,000, surplus, $1,800, and undivided profits of $346.96. Arthur J. Baxter was its cashier and active managing officer. It operated under the bank guaranty law of this state. In some way Baxter got connected up with J. E. Brady, R. N. Stout and their associates, who posed as investment brokers in Kansas City. Perhaps it is not too harsh to characterize them collectively as a bunch of crooks, but it is clear that neither Mr. Christeson nor any of plaintiff's officials or representatives knew of that fact at the time they began the negotiations which gave rise to the controversy in this case. Baxter, Brady, Stout, Shockey, and other of their associates, have since been indicted in federal court for using the mails in a scheme to defraud in connection with the transactions here involved and others similar to it, and Brady and Baxter have been tried and found guilty on many counts. Beginning in 1921, or early in 1922, and continuing until after January 12, 1923, when Baxter needed money for his bank, which was quite frequently, he would take the matter up with Brady and his associates and some scheme would be devised to obtain it. These involved the issuance of time certificates of deposit by Baxter on the Vernon State Bank. The bank books, imperfectly kept by Baxter, showed many certificates of deposit issued to Stout, Shockey and other associates of Brady for various amounts. Others showed up as having been issued which did not appear upon the books. Some of these were delivered to Brady and his associates to be sold or otherwise disposed of. For some of them the proceeds were received by the bank either at the time they were issued or later, but for some of them no proceeds were shown by the bank to have been received. Of these, some of them were returned and canceled, others were still outstanding when the bank was finally closed and taken charge of by the bank commissioner. Brady had many aliases which he used when necessary or convenience prompted their use. He and Stout officed together, and it is difficult to tell whether the communications or transactions in Stout's name were by Stout or Brady.

In some way the officials of plaintiff learned that Stout purported to be in position to place money in banks of good standing on time deposit for six to twelve months at four per cent. There is a controversy as to how plaintiff's officials learned of that, but we do not regard it as material. About January 1, 1923, Mr. Christeson, acting for plaintiff, wrote to R. N. Stout at Kansas City, applying for deposits on time certificates to the amount of five or ten thousand dollars. He inclosed a copy of the last official statement of plaintiff's bank. On January 3 Stout replied as follows:

"Thanks for your letter. At this time I am able to put out some money on time deposits of six months at 4 per cent per annum. I am reasonably sure I can use your certificate on that basis up to $7,500. And, with your coöperation, I may be able to please two concerns at one and the same time. For example: Kansas. A small bank, whose deposits are guaranteed by the state and whose statement as of December 30 is herewith inclosed, has arranged with us to handle some 6 months' 4 per cent guaranteed C/D's for it. You take from me $2,500 of this bank's certificate and I will undertake to handle $7,500 of yours. All transactions confidential and handled with caution and discretion. Phone me at my expense Harrison 4206 if interested."

Inclosed with this was a letter commending R. N. Stout, signed by D. W. Ross, special deputy bank commissioner of Missouri. Ross was later prosecuted in connection with these matters, but the letter naturally gave plaintiff confidence in Stout. Also was inclosed the financial statement of what proved to be the Vernon State Bank as of December 27, 1922, but the name or location of the bank was not on the statement. On January 4 Mr. Christeson wrote Stout as follows:

"Your letter of the 3d received, and note what you say about giving us a time certificate $2,500 of a Kansas bank, and at the same time putting with us $7,500, both to run six months at 4 per cent. This seems to be a proposition of coöperation of which we have no objection, providing, however, we know more of the institution we are to deposit with. The statement you inclose, while small, seems to be a small country bank, and while no doubt it is perfectly safe, we would like to know the age of the bank, the name of the town it is situated in, whether agriculture, mining or manufacturing, that is of what support the bank has as its clients? And also as to its officers. We would not be technical, though naturally cautious, and desire to be safe. We know of several small banks in Missouri that are perfectly safe and such arrangements would be satisfactory. On our bank and statement we ask you for full investigation. And are not jealous about it. We await your further reply."

On January 6 Stout wrote Christeson as follows:

"It was an omission on the part of the stenographer that the statement sent you did not show name of bank. It is Vernon State, Vernon, Kansas. Three years old. No bills payable or rediscounts. It is a very high class agricultural district in Woodson county. A small town and small bank, but excellent; in fact, while it is rarely ever necessary, I would be willing to indorse their certificate. Please phone me Monday morning if interested."

On January 4 Mr. Christeson wrote Fred Todd, cashier of the Columbia National Bank, of Kansas City, a personal acquaintance, and asked for information about Stout's transactions. A copy of this letter is not in the record, but on January 6, Mr. Todd wrote Christeson as follows:

"The following is matter of opinion, written in strict confidence for your private use only, without guarantee or liability, and in response to your inquiry of the 4th, in regard to one Mr. R. N. Stout.

"I find that Mr. Stout is in room 720 Commerce building, sharing office with another party. Mr. Stout is not listed in the telephone directory. I went up and had a talk with this gentleman, of course not telling him from whom my inquiry was from. He tells me he is in the investment business and he at times gets hold of some 'cheap money,' and that he picked out a number of banks and wrote them offering to place the money on time deposit. He says, however, that he does not in any instance require the banks to put a portion of his deposit in any other bank. I asked Mr. Stout where he was doing his banking business, and after he told me I called at this bank, but could not get any information in regard to his business dealings whatever. . . . It seems to me, however, that this is an unusual transaction, and if I were you I would be particularly interested in knowing the kind of items which I received from him, and I would not issue any negotiable instruments until I knew that the items received from him were genuine and paid. Also that they were received by the party to whom they were issued.

"I am sorry that I cannot give you any more definite information in regard to this matter, but I am sure I will be glad to have you write me at any time I can serve you.

"With personal regards and best wishes, I am."

About the same time Mr. Christeson called the secretary and treasurer of the Commerce Trust Company of Kansas City, with whom he was acquainted, and asked if the Vernon State Bank was operating under the guaranty law of the state of Kansas, and was informed that it was. On January 8, Christeson wired Stout as follows:

"We accept your proposal 3d and 6th; you may mail draft, and advise to whom the certificate is to be issued to, also instructions to mail draft to Kansas bank."

As a result of this correspondence Stout called Christeson by tele-

phone and told him to make out a certificate of deposit for $7,500 to S. A. Shockey and send it to the Metropolitan Bank, Kansas City, Mo., with a draft for that amount attached, and that it would be paid, and at the same time to mail draft or cashier's check for $2,500 to the Vernon State Bank, and that he would receive their time certificate for like amount bearing four per cent interest. On January 9 plaintiff issued its cashier's check, payable to the Vernon State Bank, for $2,500 and mailed it direct to the Vernon State Bank, with the following letter:

"We are inclosing you herein our check for the sum of $2,500, which we will accept your time certificate for like amount, payable in six months, bearing 4 per cent interest. Make out the certificate direct to this bank, and register same in the inclosed addressed envelope.

"This is being sent to you in accordance with an understanding with Mr. R. N. Stout, Kansas City, Mo.

"Will you please mail us copy of your last statement."

Under date of January 12 a certificate of deposit on the Vernon State Bank was issued by Arthur J. Baxter, cashier, to the Peoples Bank for $2,500 for six months and bearing four per cent interest. This was accompanied by letter of transmission and a statement of the bank taken from the books at the close of the business January 10. The books of the Vernon State Bank do not show a certificate issued to the Peoples Bank, but do show one issued to Christeson. There was evidence tending to show that a certificate was first issued to Christeson, which was later taken up and issued in the name of the plaintiff bank; but this was controverted, and we do not regard it as material. The Vernon State Bank cleared the cashier's check of plaintiff through its Kansas City correspondent and received credit.

The $7,500 certificate of deposit issued by the plaintiff bank to S. A. Shockey was for six months and drew interest at four per cent. It was sent to the Metropolitan Bank at Kansas City with sight draft for $7,500 attached, and that bank was asked to wire plaintiff whether the draft was paid. It was plaintiff's intention to stop payment on its cashier's check sent to the Vernon State Bank if its draft for $7,500 on Shockey was not paid. Mr. Christeson understood that he could do that. Whether that was his understanding of the law or his understanding with Stout and Brady is not clear, and perhaps is not material, but he is positive in his testimony that he was making the deposit in the Vernon State Bank

Peoples Bank v. Bone.

only upon condition and only in the event that plaintiff received $7,500 on its certificate of deposit issued to Shockey. Plaintiff's purpose in this transaction as a whole was to get $5,000, the difference between the two items, for six months at four per cent, which was less than it was paying on its own time certificates of deposit previously issued and on money which it was then borrowing. The making of the deposit in the Vernon State Bank was only an incident of its borrowing money, and was dependent upon its receiving the $7,500 on its certificate of deposit.

The $7,500 certificate of deposit issued by plaintiff to Shockey with sight draft attached was handled by Brady and his associates in this way: They had previously arranged for Shockey to handle it. Shockey had gone to the Metropolitan Bank and there arranged to have that bank handle this certificate of deposit, which that bank agreed to do at a named discount (the amount of this discount is not shown), and to further secure the Metropolitan Bank Shockey furnished that bank a bond executed by the Fidelity and Deposit Surety Company of Baltimore that plaintiff's certificate of deposit would be paid at maturity. Shockey sold plaintiff's certificate of deposit to the Metropolitan Bank, paid the discount, and furnished the surety company bond, and in that way procured the money to pay the draft of $7,500 drawn on him by plaintiff, and the Metropolitan Bank on January 10 wired plaintiff that its draft on Shockey had been paid. Brady and Stout furnished Shockey the money to pay the discount to the Metropolitan Bank and to pay the premium on the surety bond, and paid Shockey $75 for his services. Just where Brady and Stout obtained the money out of this transaction to pay Shockey and to compensate them for their own services is not clear, but perhaps that is not of much importance. They had certificates of deposit issued by Baxter on the Vernon bank upon which no money had been paid at the time they were issued, which they were endeavoring to sell or negotiate, and it is reasonable to presume they were reimbursed out of these or from Baxter direct. Plaintiff's officials knew nothing of the specific manner in which this was handled other than such information they would have from the correspondence and transactions hereinbefore set out.

The question arises whether this constitutes a deposit by plaintiff in the Vernon bank within the meaning of our statute. The statute in force at the time the certificate in question was issued (Gen. Stat. 1915, § 600), reads as follows:

"All deposits not otherwise secured shall be guaranteed by this act. The guaranty as provided for in this act shall not apply to a bank's obligation as an indorser upon bills rediscounted, nor to bills payable, nor to money borrowed from its correspondents or others." (See it as amended, R. S. 9-206.)

And section 559 provides:

". . . It shall be unlawful for any. bank to issue its certificate of deposit for the purpose of borrowing money."

Defendant contends that this was not a *bona fide* deposit by the plaintiff with the Vernon State Bank, and, second, that the transaction was a lending of $2,500 by the plaintiff bank to the Vernon State Bank, which $2,500 was in turn furnished to the plaintiff bank by S. A. Shockey for the purpose of being lent to the Vernon State Bank.

Plaintiff contends that having sent its cashier's check to the Vernon State Bank for $2,500, which sum was received and placed to the credit of the Vernon State Bank, for which a certificate of deposit was issued, it became a depositor, within the meaning of the law. And further contends that the arrangement of plaintiff with Brady, Stout and Shockey did not change its relation as a depositor with the Vernon State Bank and the lawful holder of a time certificate of deposit issued by that bank. And further contends that irregular or fraudulent conduct of Baxter, Brady and their associates, with which plaintiff was in no wise connected and which was not known to plaintiff, could not affect its relation as depositor with the Vernon State Bank.

In states having bank deposit guaranty laws controversies have frequently arisen as to what constitutes a deposit within the meaning of the law. Many cases have arisen over the question. Our own court has had the question before it. Perhaps it is difficult to lay down a general rule, or give a. general definition of the word "deposit" that would be accurate under all the varying circumstances which have arisen or may arise; but one thing has been definitely determined—courts, in determining whether a certain transaction constitutes a deposit, are not limited to the immediate act concerned in the transaction claimed to constitute the deposit, but may, for the purpose of determining whether there is a *bona fide* deposit within the meaning of the statute, look into and consider all the circumstances disclosed by the evidence pertaining to the transaction. In *State, ex rel. Spillman, v. Gross State Bank,* 113 Neb. 119, it was said:

Peoples Bank v. Bone.

"The law will look through all semblances and forms to ascertain the actual facts as to whether there has been a *bona fide* deposit, and, if not, the guaranty fund does not protect the transaction, no matter how it may be evidenced." (p. 120.)

Looking at this case as a whole, did the plaintiff bank make a *bona fide* deposit in the Vernon State Bank? The answer must be that it did not. Plaintiff and its officers knew nothing of the Vernon State Bank, had no business relations with it, and had no intention of making a deposit of any character therein. What it was trying to do was to get money at a lower rate of interest than it was then paying. Crediting plaintiff with the utmost good faith, and conceding for this purpose that its officers could close their eyes to the information received from the first letter from Stout indicating that he was hawking or peddling the certificates of deposit of the Vernon State Bank, the caution from Mr. Todd, and the unusual nature of the transaction as a whole, still the fact remains that the sole purpose of plaintiff was to negotiate a loan at a low rate of interest. Plaintiff had no intention of making a deposit with the Vernon State Bank unless the deal as a whole went through, and had an understanding from some source that it was authorized to stop payment on its own cashier's check to the Vernon State Bank if its draft for $7,500 on Shockey was not paid. When you look at the transaction from the viewpoint of the Vernon State Bank, it is subject to even more censure. The bank, with Baxter as its manager, and Brady and his associates, were evidently conducting a wholesale plan of issuing certificates of deposit on the Vernon State Bank, in part only for the benefit of the bank, and in part for their own use. So, viewing it from either side, it lacks every element of the ordinary *bona fide* deposit in a bank. Plaintiff cites and relies upon *Mortgage Trust Co. v. Bank Commissioner*, 110 Kan. 786, 205 Pac. 610, and *Bank v. Bank Commissioner*, 112 Kan. 141, 210 Pac. 490, and *Crummer v. Wilson*, 119 Kan. 82, 237 Pac. 1036. These cases are readily distinguishable from the case before us. It will not be necessary to analyze them in detail. It is sufficient to say that we do not care to extend those decisions to a situation such as here presented.

Judgment will be entered for defendant. It is so ordered.