## CHARLESTON.

### A. SMILEY *v.* BANK OF WYOMING

### (No. 5928)

Submitted November 8, 1927.   Decided November 15, 1927.

1.   BANKS AND BANKING—*Bank Directors' Acceptance of Benefit of Bank President's Unauthorized Contract Purchasing Land Held to Bind Bank.*

   Where the president of a bank is authorized by its directors to purchase real estate for the bank, and in making the contract of purchase exceeds his authority, and afterwards the directors having full knowledge accept the benefits of the contract, they thereby ratify the contract and the bank is bound by it.   (p. 475.)

   (Banks and Banking, 7 C. J. §§ 140, 141.)

2.   USURY—*Borrower, to Whom Bank Lends Money on Other's Notes Secured by Liens on Borrower's Property to Conceal Excess of Loans to Him, May Recover Usury Exacted; Plea of Usury is Personal to Borrower, to Whom Loans Were Made on Notes of Others Secured by Liens on Borrower's property (Code, c. 96, § 5).*

   Where a bank loans money to a borrower, but in order to prevent its books from showing an excess of loans to that borrower, it takes the notes of other persons, secured by liens on the property of the borrower to whom it looks for payment, then the borrower who has paid the loans may recover from the bank any usury exacted from him.   The plea of usury in such case is personal to him.   (p. 477.)

   (Usury, 39 Cyc. pp. 999, 1030, 1062.)

   (NOTE:  Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Wyoming County.

   Action by A. Smiley against the Bank of Wyoming.   Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*D. D. Moran,* for plaintiff in error.

*F. E. Shannon,* for defendant in error.

LIVELY, JUDGE:

Upon a verdict in favor of A. Smiley against the Bank of Wyoming for $2,397.76, a judgment was entered on November 6th, 1926, from which the bank prosecutes error. The claim of plaintiff on which the verdict and judgment was based consisted of two items; namely: usurious interests collected from him by the bank, amounting to $2,025.75, and interest on same of $364.65; and amount due to him from the bank for one-half of the costs of a party wall, amounting to $1,375.00, and interest upon same of $37.50, making a total claim of $3,802.90. The bank pleaded *non-assumpsit,* the statute of limitations and the statute of frauds. After motions to strike the two special pleas of limitations and statute of frauds were overruled, issue was joined thereon.

### FIRST, AS TO THE PARTY WALL:

It appears that the bank prior to March 18th, 1921, desired to· purchase lots 1 and 2 of block C in the town of Mullens, and J. C. Sullivan, its president, procured plaintiff, A. Smiley, to make the purchase from Deegans, Trustee, for $25,000.00. Smiley negotiated the purchase and took a deed to the lots on March 18th, 1921, in his own name, and placed it to record. He paid a part of the purchase price and executed his notes for deferred payments. Smiley says he dealt with Sullivan and never knew the bank had an interest in the transaction. It appears that after his purchase, he began erecting and did erect a hotel on the western portion of the lots, being thirty-five feet fronting on first street and running back diagonally a distance of about sixty feet, making a width of fifty feet on the rear. On June 25th, 1921, at the direction of J. C. Sullivan, the president, he executed his deed to the bank for the eastern portion of the lots for $19,000.00. One-half of the eastern wall of the hotel was laid on the part conveyed to the bank. He says that Sullivan, as president agreed to pay him for one-half of the wall when completed, and that since the hotel was completed the bank has erected a building on the part deeded to it and used the wall. Smiley says he bought the two lots for himself and Sullivan, and all his negotiations were with Sullivan. J. A. Toler

who was attorney for both the bank and Smiley, prepared the deed of June 25th, 1921, from Smiley to the bank, according to directions given him by Sullivan and Smiley. First the deed contained a promise for payment of one-half the wall by the bank, but when it was submitted to Daubenspeck, cashier of the bank, the latter advised him that they wanted a plain fee simple deed, and directed it to be rewritten, eliminating therefrom the provision requiring payment for one-half the wall, and requested him to prepare a separate contract about the wall. A deed was then prepared bearing date June 25th, 1921, signed and acknowledged by A. Smiley and wife as of that date, and delivered to the bank, and admitted to record................23rd, 1921, conveying an individual one-half interest in the wall and declaring it to be a party wall. A contract was also prepared by which the bank was to pay for one-half the party wall, and left at the bank, but Sullivan as president refused to sign, presumably because Smiley had not yet delivered the deed, but was holding it until the contract was signed. Toler then told Smiley to deliver the deed, which was done, telling him that he would get Sullivan to fix up the party wall matter when the latter got in a better humor; and later Sullivan told him that it would serve no use to sign the party wall contract, as they would give Smiley credit for one-half the costs thereof, when ascertained, on his notes then in the bank. Toler says that he later got a statement of costs of the wall, one-half of which was about $1,350.00, and delivered it to Sullivan in the presence of McNeil, (a director), and was told that they would later give Smiley credit on one of his notes. The credit was never given, Smiley's notes having been paid in full by a corporation which took over the hotel for the purpose of operating it. Toler says that when he took the first draft of the June 25th, 1921, deed, providing therein for payment of one-half the party wall by the bank to Smiley, down to the bank, several of the directors were present, that Wood, Frank and McNeil (directors) were there with Daubenspeck, the cashier (and director), when the latter told him they wanted an absolute deed and did not want the party wall agreement in the deed. It appears that plaintiff is an Assyrian, and could not read or write in English, and

relied wholly upon his attorney, Toler, as to the contents of any writing, and signed wherever his attorney directed him to do so.

On behalf of defendant, Daubenspeck says that the board of directors never agreed to pay plaintiff for one-half the costs of the wall and never did pay him because they considered that he had taken a larger portion of the two lots for $6,000.00 than he was entitled to. He says he was present when Toler brought the contract to be signed by Sullivan and Sullivan refused to sign because Smiley had not delivered the deed. While some of the directors, including himself, objected and protested against allowing Smiley to retain a little more than one-third of the two lots at $6,000.00, no protest was made of record, nor to Smiley, and his deed was accepted and placed to record. It appears that no record was made by the directors concerning the purchase of the lots, from its inception to its close, although it was well known to them that the lots were being purchased for the bank through Smiley. Sullivan thought that Deegans, Trustee, the owner, would not sell if he knew that Sullivan was the buyer for the bank; hence the indirect way of purchase through Smiley. Dr. Wood, a director, says that the bank never agreed to pay Smiley for the party wall, although no record of refusal was made; that the matter was talked over informally among some of the directors at different times, and they considered that Smiley had retained more land at $6,000.00 than was just and proper; that he should have been required to pay at least $8,000.00 for the part he retained, and they considered that this difference paid him for the party wall. J. A. Mace, a director, says the matter was brought up and the directors considered that Smiley was getting the price of the party wall in his share of the lot, and that they never agreed to pay him for the party wall. He says this attitude was taken by the directors about August 1922, after the hotel was erected. He says the bank refused to accept the deed because it did not include the party wall. H. W. McNeil, a director, who became such January 1st, 1922, says that several of the directors were adverse to paying for the party wall, while Mr. Sullivan was favorable to it. He says that in a conver-

sation at the hotel in May or June, 1921, between Toler, Sullivan and himself, he gathered the impression that Sullivan had agreed in some manner to pay Smiley for the party wall. Sullivan was not a witness. This is the substance of the evidence relating to the party wall claim. From this evidence it appears that the bank desired to purchase the two lots, and knew that Smiley, through Sullivan, acted for them. Smiley borrowed from the bank the down payment, and the bank knew the purpose of the loan. The officers of the bank knew that Smiley had taken the title in his own name and had begun the erection of a hotel on the western one-third of the lots. He borrowed the money from the bank to build the hotel. On June 25th, 1921, the bank knew that Smiley was retaining a little more than one-third of the lots on which he was erecting the hotel, at $6,000.00, and requiring payment for one-half of the cost of the wall. The cashier in the presence of some of the directors requested payment for the party wall to be eliminated from the deed tendered to the bank, and that a separate contract concerning the party wall be prepared. The deed and contract were so prepared, but the contract was not signed by the president because the deed had not been delivered. The bank's officers deny contribution for the wall on the theory that Smiley should have paid at least $8,000.00 for his part of the lots, and therefore he was not entitled to be paid for the wall. Sullivan agreed to pay by having the amount when ascertained credited on Smiley's note in the bank. Smiley was dealing with Sullivan and knew nothing of the bank's interest in the matter, except that he made his deed to the bank by direction of Sullivan and Toler. He did not know that the directors had informally determined that he was not to be paid because the bank did not get enough land when he delivered the deed. Sullivan had agreed with him that he could erect his wall as a party wall and that he would be repaid for one-half thereof when finished.

No instructions were given to the jury. Defendant made a motion to strike out all of Smiley's evidence of his agreement with Sullivan, on the theory that Sullivan had no inherent power or authority as president to contract with

Smiley. This motion was overruled, and defendant's counsel says it was error, citing *First National Bank* v. *Kimberlands,* 16 W. Va. 555; *Thompson* v. *Mfg. Co.,* 60 W. Va. 42; *Bank* v. *Mfg. Co.,* 56 W. Va. 446, and *Varney and Evans* v. *Lumber Co.,* 70 W. Va. 169. The principle of law enunciated in these cases is that where an agent acts beyond his authority, the relation of principal and agent does not exist as to that act and the principal is not bound. But does this principle apply here? Sullivan was acting for the bank, by its directors, for the purchase of these lots. The bank is bound by his acts in making that purchase which was within the scope of his authority. His authority was to get these lots through some one, without the bank being known in the transaction. No restrictions upon him seemed to have been imposed in dealing with that other person in acquiring the lots. He made the contract with Smiley who had no notice of the agency, and therefore no duty involved on him to inquire as to its scope. By that contract Smiley was to purchase the lots for Sullivan and himself, and he, Smiley, was to have a certain portion at $6,000.00, and Sullivan the other part at $19,000.00; that Smiley could erect a wall on the line dividing these parts and when finished he would be paid one-half the costs. Knowing that such was the contract, the bank accepted its benefits by taking the deed, but by informal understanding of a majority of the directors repudiated its obligations. Smiley was not notified. He was led to believe that he would be paid, and delivered his deed. Toler understood that Smiley would be paid, and was directed by Daubenspeck, cashier, and director, in the presence of other directors to incorporate an agreement for payment in a separate contract.

Where the acts of an agent are unauthorized, if the principal accepts the benefits of that act it cannot repudiate the obligations arising under it. "Where a private corporation accepts the benefits of a contract made on its behalf by an unauthorized agent it thereby ratifies the contract in its entirety and will be bound to perform its obligations provided for by the contract to be performed on its part." *Chafin* v. *Main Island Coal Co.,* 85 W. Va. 459, and citations on page 464; *McDermott* v. *Gas & Light Co.,* 88 W. Va. 692; 7 C. J.

537, Sec. 140. And in the case of *Bank* v. *Kimberlands,* 16
W. Va. 555, *supra,* cited by defendant's counsel, it was held
that the directors of a bank may ratify any act done or con-
tract made by an officer without authority, which they could
have authorized him to do or make, and that the acceptance of
the benefits of the transaction amounts to an implied ratifi-
cation of the contract. There was no error in permitting
plaintiff's evidence of his dealings with Sullivan to go to the
jury.

### ON THE ITEM OF USURY

Plaintiff testified that he began borrowing from the bank
in 1921, and had borrowed to the extent of $38,500.00; that
$12,000.00 of this sum was represented by a note signed by
J. A. Toler, to whom he had deeded real estate worth $15,-
000.00, and Toler had executed his trust deed to the bank on
this real estate to secure payment of the borrowed money;
that he had paid the interest on all renewals at 8%; and
that the carrying of the $12,000.00 note in Toler's name was
to prevent the books from showing an over-loan to one person,
and that it was made and secured in this way by direction
from the bank. Toler says the $12,000.00 note although
signed by him was in reality a loan to Smiley and the pro-
ceeds went to Smiley; that the method of making the loan
was arrived at by conference with the president and cashier
of the bank to avoid an over-loan on the books to Smiley; that
the real estate deeded to him by Smiley and on which the
deed of trust to secure the bank was given, was deeded to him
without consideration. He says that the original note was en-
dorsed by Smiley. There is no evidence contradicting these
facts, except that Daubenspeck says that Smiley did not en-
dorse the Toler $12,000.00 note, as that would have shown that
Smiley was the borrower on the books, a situation which the
arrangement was designed to prevent. The evidence is con-
clusive that Smiley was the borrower, and that the use of
Toler's name, and also the use of the name of Smiley's wife,
Bridge Smiley, on two other notes, was for the purpose of
indirectly making the loans to Smiley. W. H. Lusk, book-
keeper of the bank in 1921-2 and custodian of the books at

the time of his testimony, lists the loans made to Smiley including two notes signed by his wife aggregating $14,652.00 and the $12,000.00 Toler note, and testifies that the excess rate of interest charged on these loans amounted to $1,047.76. There is no evidence to controvert the amount of the usury charged. The only point raised against the usury is that the plea of usury is personal and can be made only by the person to whom the loan was made and not by a stranger; therefore, Smiley could not plead usury on the Toler note or on his wife's notes; that Toler and the wife only could file the pleas. That the plea of usury is a defense personal to the debtor is quite well established. *Lee* v. *Feamster,* 21 W. Va. 108; *Spengler* v. *Snapp,* 5 Leigh 478. Numerous cases so hold. The debtor here is Smiley, not Toler or Smiley's wife. Everybody so understood that Smiley was the borrower. He paid the discounts, had the notes renewed, and they were paid off directly or indirectly by him. The statute, chapter 96, Sec. 5, Code, says that, "All contracts and assurances made directly or indirectly for the loan or forbearance of money or other thing at a greater rate of interest than 6% * * * shall be void as to any excess of interest agreed to be paid above that rate, and no further." Smiley was the borrower from the bank; whether directly or indirectly is immaterial. He was entitled to set up and recover the usury exacted from him. The amount due for the party wall is not less than $1,350.00, and the usury is $1,047.76. There is no controversy as to the amounts. The verdict is the exact total of these two sums.

There is no reversible error, and the judgment is

*Affirmed.*