COMMERCIAL BANKING & TRUST COMPANY *v.* DODDRIDGE COUNTY BANK *et al.*

(No. 8625)

Submitted September 28, 1937. Decided November 23, 1937.

HATCHER and FOX, JUDGES, dissenting.

*Robinson & Stump,* for appellants.
*Reese Blizzard, A. G. Mathews* and *S. A. Powell,* for appellee.

RILEY, JUDGE:

This is a suit in chancery brought by Commercial Banking & Trust Company, a domestic banking institution, incorporated, of Parkersburg, against the Doddridge

County Bank, a domestic banking institution, incorporated, of West Union, E. A. Rinehart, its receiver, George Ward, Commissioner of Banking, and C. E. Lawhead, as receiver for a number of closed banks. Its primary purpose, since the dismissal, on demurrer to the bill, of C. E. Lawhead, receiver, etc., from the suit (*Commercial Banking & Trust Company* v. *Doddridge County Bank et al.*, 118 W. Va. 37, 188 S. E. 663), is to require the receiver to account for and turn over certain notes, or amounts realized therefrom, pledged as collateral to a bond, given by the Bank to further secure the Trust Company in what the latter alleges was a loan. The answer on behalf of the Bank challenges the agency of L. R. Charter, Jr., who engineered the original transaction, and denies his authority to act for it; it also denies that the transaction was a loan, asserting that the same was a deposit, and that, being a deposit, the Bank was without power to pledge the notes set out in the bond, which was executed approximately fifteen and one-half months after the original transaction. From a decree finding, among other things, that the transaction was in fact a loan; that the bond was valid; and that the notes pledged were property of the Trust Company for purposes of said pledge, the Doddridge County Bank and E. A. Rinehart, receiver of said Bank, appeal.

Charter, prior to his appointment as Commissioner of Banking, had been president of the Bank, and after termination of his duties as commissioner, was restored to the presidency in the place of J. G. Charter, a brother, who had been president during the former's term as commissioner. The Bank was generally known as the Charter Bank. L. R. Charter, Jr., was recognized as the dominant spirit, and continued, while Commissioner of Banking, to be active in securing deposits for the Bank, and became surety on several depository bonds.

Sometime prior to October 16, 1931, Charter, then Commissioner of Banking, approached Blizzard, president of the Trust Company, with reference to a deposit by Lawhead, receiver, of receivership funds, explaining that the Doddridge County Bank had a good deposit from Lawhead, and that he, as Banking Commissioner, would

rather that this, or at least a part of the deposit, be in some other bank. This, according to the allegations of the bill of complaint, not denied in the answer, was followed by a proposal, that if the Trust Company felt like letting the bank have about $40,000.00, he believed that Lawhead would deposit with the plaintiff an equal sum of receivership moneys. On this point, Blizzard testified that Charter inquired that if Lawhead would make a good deposit with the Trust Company, how would the latter feel about making a corresponding deposit in size with the Bank; that whatever Lawhead deposited with the Trust Company, the latter was to deposit an identical amount with the Bank. This deposit, according to Blizzard, would remain with the Trust Company until the money deposited by it in the Bank was repaid. In other words, the receivership account with the Trust Company was at no time to be reduced below the amount advanced to the Bank, nor was the amount so advanced to be drawn against by the Trust Company. While there seems to have been no mention of weeks or months in connection with the proposal, Blizzard states that "the words 'in a little while' or 'very soon' or something of that kind was implied"; that neither he, nor the Trust Company, would have agreed to the "loan or deposit * * * except for a very short period of time." Blizzard was advised that the Bank was solvent and all right in every respect. The proposal was presented to and approved by the Trust Company's board of directors, and Charter advised of its action. Shortly thereafter, to-wit, October 19th, two checks, drawn on the Doddridge County Bank, and signed by Lawhead, receiver, and totalling $39,082.88, were received at the Trust Company's banking rooms, one by early mail, and the other, delivered by Miss Charter, a sister of the then Commissioner of Banking. The checks were thereupon endorsed by one of the officials of the Trust Company, and handed to Miss Charter. The records of the Doddridge County Bank show a deposit of two checks, on October 21st, to the credit of the Trust Company. Blizzard had no conversation with Lawhead relative to Charter's proposition until after the presentation and endorsement of the Lawhead checks.

The transaction was set up on the Trust Company's books as follows: (1) as a deposit by C. E. Lawhead, receiver, and (2) the Doddridge County Bank was charged with a like amount, on the general ledger, under "Cash and Due From Banks" (one of the three classifications of receivables, the other two being "Loans and Discounts" and "Other Resources"). Had the Bank given a note for $39,082.88, the transaction, according to the officers of the Trust Company, would have been entered under "Loans & Discounts". All moneys due the Trust Company from banks or loans were carried in separate accounts in the general ledger. The assistant cashier of the Trust Company, in making up the report reflecting the condition of the institution, as of December 31, 1931, inquired of L. R. Charter, Jr., who happened to be present at the time, regarding the way the transaction should be carried in the report, and was instructed to follow the original entry. The Bank, however, carried the transaction as an individual deposit to credit of the Trust Company, and the same appeared in the Bank's periodic reports along with other individual deposits.

Lawhead made additional deposits to his account in the Trust Company in November, 1931; May, 1932; and January, 1933. It appears that some time prior to March 22, 1932, he was permitted to make withdrawals with the understanding that the account would be promptly restored to its original total. On the last-mentioned date, we find Blizzard writing to Lawhead to the effect that the latter had reduced his account with the Trust Company to a point below the amount which originally had been placed with the Bank, and asking for a deposit to carry out the original understanding, or that he have the Bank remit to the Trust Company so that the original understanding would be preserved. Lawhead replied on March 23rd that he would see that the account was restored to the original balance of $39,000.00, as he "was not conscious that it had dropped below that figure." Some months later (February, 1933) the Bank, at the request of the Trust Company, made delivery to the latter of collateral, totalling $41,000.00. A bond was prepared at the Trust Company, listing the collateral, and

the same together with the collateral forwarded to the Bank—the bond to be executed and returned to the Trust Company, and the collateral to be retained by the Bank, as property of the Trust Company, for purposes of collection and renewals. This latter arrangement to secure the Trust Company was due primarily to repeated demands on the part of the receiver, for a bond from the Trust Company securing receivership deposits and for the unrestricted right to check against said deposits. All the notes listed in the Bank's bond, and not paid, are now in the hands of Rinehart, receiver.

It further appears from the evidence that on July 18, 1933, the date of closing, the Bank was 52% insolvent.

A domestic banking institution, under Code 1931, 31-4-6, is expressly granted the right to borrow money. And as a necessary incident to its banking business may lawfully become a depositor of another bank. *State ex rel. Carroll* v. *Corning State Savings Bank,* 136 Iowa 79, 113 N. W. 500; *Leach* v. *First National Bank,* 206 Iowa 265, 217 N. W. 865; 7 Zollman, Banks & Banking, section 4971.

If the transaction was, in fact, a loan, the Bank undoubtedly had authority to pledge notes, etc., as collateral to secure the same. Code 1931, 31-4-9.

Before beginning an analysis of the instant case, it is imperative that we get a picture of the fundamental differences between a "loan" and a "deposit", as those terms are used in general banking practice. We look in vain for a comprehensive distinction. All attempted definitions recognize the close relation between the two and the difficulty of laying down a specific rule of distinction, applicable alike to all cases. *Murray* v. *First Trust & Savings Bank,* 201 Iowa 1325, 207 N .W. 781, 783; *Peoples Bank of Dixon* v. *Bone,* 121 Kan. 768, 250 P. 276, 279. One court observes: "Bank deposits and bank borrowings are alike in but one respect that one result of each is the relation of debtor and creditor. In every other respect the two operations are not only different but in complete antithesis." *Farmers' & Merchants' State Bank* v. *Consolidated School Dist. No. 3,* 174 Minn. 286, 291, 219 N. W. 163, 165, 65 A. L. R. 1407.

In practically all the cases we have examined we find expressions to the effect that a loan is for the benefit of the borrower, while a deposit is for the benefit of the depositor. *Schumacher* v. *Eastern Bank & Trust Co.* (C. C. A.), 52 Fed. (2d) 925; *Hunt* v. *Hopley,* 120 Iowa 695, 95 N. W. 205; *Elston, Prince & McDade* v. *First State Bank,* 19 La. App. 385, 140 So. 510; *First American Bank & Trust Co.* v. *Palm Beach,* 96 Fla. 247, 117 So. 900, 65 A. L. R. 1398; *Allibone* v. *Ames,* 9 S. D. 74, 68 N. W. 165, 33 L. R. A. 585; *Shaw, Banking Com'r.* v. *McBride* (Tex. Civ. App.), 9 S. W. (2d) 401. "The main purpose of a loan is investment. The main purpose of a deposit. is safe-keeping." 5 Zollman, Banks & Banking, sec. 3154, citing *Warren* v. *Nix,* 97 Ark. 374, 135 S. W. 896, 898. "A 'loan' to a bank implies a definite time of repayment when the bank must tender, whereas, a 'deposit' may be retained until payment is demanded." 1 Michie, Banks & Banking, 51, sec. 43. See footnote 32, p. 52. The following comprehensive summation of recognized differences is found in *Schumacher* v. *Eastern Bank & Trust Co., supra*: "A loan is primarily for the benefit of the bank; a deposit is primarily for the benefit of the depositor. A loan is not subject to check; a deposit ordinarily is. A loan usually arises from the necessities of the borrowing bank; a deposit, from the confidence of the depositor in its strength. A loan ordinarily is sought by the bank for its own purposes; a deposit is ordinarily made by the depositor for purposes of his own." The above observations of Judge Parker, while of necessity very general in nature, are helpful.

It is readily seen from the foregoing that the courts recognize that a distinction between a deposit and a loan does exist. Whether in a given case a transaction is to be deemed the one or the other is a question to be determined from the surrounding circumstances, regardless of what the parties to the transaction may call it. *Murray* v. *First Trust & Savings Bank, supra; State ex rel. Carroll* v. *Corning State Savings Bank, supra; Shaw, Banking Commissioner* v. *McBride, supra; Peoples Bank of Dixon* v. *Bone, supra; State ex rel. Davis, etc.,* v. *Wayne*

*County Bank,* 112 Neb. 792, 201 N. W. 907; *Schumacher*
v. *Eastern Bank & Trust Co., supra.*

In the *Schumacher* case, the receiver sought to secure
possession of certain notes and securities pledged by his
bank prior to its insolvency to the defendant trust com-
pany as security for certain advancements, and to have
the pledge declared void. From the statement of facts in
the opinion, it appears that the bank, being in need of
money, approached the defendant and secured a loan, as-
signing and pledging as collateral certain notes and se-
curities, and executing an assignment. In the assignment
was a recital that the trust company had deposited with
the bank the amount secured. The account therein was
handled on the books and in the reports of both parties
as indebtedness between banks, i. e., on the ledger of the
insolvent bank as "due to banks", and on that of the trust
company, "due from banks". The circuit court of ap-
peals, after considering the factual situation, brushed
aside the use of the word "deposited" in the assignment,
and found the transaction to be a loan.

In the case of *State ex rel. Carroll* v. *Corning State Sav-
ings Bank, supra,* a transaction between Des Moines Na-
tional Bank, intervenor, and the savings bank, involving
a certificate of deposit issued by the latter, in view of
the facts and circumstances surrounding the same, was
held to be a loan, although the president of the intervenor,
in response to the savings bank's request to send more
money, had, by letter, offered to deposit more money
with, and refused to make a loan to, the savings bank.

In *Peoples Bank of Dixon* v. *Bone, supra,* the plaintiff
instituted a proceeding in mandamus to require bank com-
missioner to issue a certificate against the bank deposi-
tor's guaranty fund, on the theory that plaintiff had a
deposit in the Vernon State Bank at the time it was
closed. The plaintiff, acting through an intermediary,
sought the funds, for which it issued its certificate of de-
posit. Although the form of the transaction was that of
a deposit, it appeared from the evidence that the plain-
tiff was trying to get money at a lower rate of interest
than it was paying; and that it had no intention of mak-
ing a deposit with the Vernon State Bank unless the deal

as a whole went through. Being in reality a loan, the judgment for the defendant was affirmed.

A case somewhat similar to the instant one is *Armstrong* v. *Chemical Nat. Bank,* (C. C.) 41 F. 234, 6 L. R. A. 226. It involved a transaction between a Cincinnati bank and its New York correspondent. The two banks had acted as correspondent banks for one another over a considerable period. The Cincinnati bank, which was endeavoring to withstand a run, until certain false rumors as to its condition had subsided, transmitted a large amount of bills receivable to its correspondent to be held by it against overdrafts in the former's account. The New York bank during the following week took up several of the Cincinnati bank's drafts. All advancements by, and overdrafts on, the New York bank, after receipt of the securities, in excess of the balance carried with the latter, were considered by the court as loans, and the correspondent permitted to reimburse itself to that extent out of the collateral forwarded it.

It is clear in the instant case that the funds were placed with the bank on the strength of Charter's solicitation. Although insufficient to sustain the chancellor's finding that the Bank was insolvent on July 16th, the evidence is, in our opinion, sufficient when considered with Charter's proposal and reasons therefor, as well as other activities on behalf of the Bank, to indicate that the advancement was sought because the Bank was in need of money. If it had been merely a matter of reducing the receivership deposits, Charter could have handled the matter without bringing the Trust Company into the picture. The transaction as between the two banking institutions was carried on the books of the Trust Company as amount due from bank. It was to be for a short while, and not subject to check. *Shaw, Banking Com'r.* v. *McBride, supra.* During such time the receivership funds were to stand as security. The banks had had no previous dealings, and no necessity was shown for a deposit for purposes of clearing checks and other banking purposes.

The presentment of the two checks, signed by Lawhead, in view of the agreement, amounted in a sense to

forwarding collateral with request that the Trust Company advance money for a period of time. The fact that the $41,000.00 of collateral was later pledged supports this position. The Bank was faced with a situation, whatever it was, which made it desirable to have certain receivership funds replaced with money not subject to check. As to the Bank, the transaction amounted to a substitution of a time item, subject to the uses of the Bank in meeting its daily obligations to its regular patrons, for a portion of Lawhead's very liquid demand deposit, which of necessity was subject to large periodic withdrawals. That it was materially benefited by the advancement cannot be gainsaid. Except for slight prestige of being depository for receivership funds, the benefit to the Trust Company was absolutely nil. The fact that the transaction was entered upon the records of the Bank as a deposit can be accorded no weight in view of the other facts and circumstances in the case.

In view of the situation presented, Judge Maxwell and I are of the opinion that the transaction was, in fact, a loan.

Although it is true that the word "deposit" is used in the bond, we do not feel that such fact should control over the other circumstances surrounding the transaction, which, in its inception, we hold to be a loan. Equity regards substance and not form, and it is not bound by the names which parties may give their transactions. *Schumacher* v. *Eastern Bank & Trust Co., supra.* The parties preparing and executing the bond, having had years of banking experience, will, in the absence of a showing to the contrary, be presumed to know that a bank is not permitted to pledge its assets to secure deposits, other than those of the United States, State of West Virginia, a county, district, school district or municipal corporation. Code 1931, 31-4-9; *Gall, Rec'r.* v. *City of Wheeling et al.,* 119 W. Va. 93, 192 S. E. 116; 65 A. L. R. 1412; 87 A. L. R. 1456.

Inasmuch as the propriety of much of the testimony supporting the loan theory is dependent upon the understanding between Charter and Blizzard, as testified to

by the latter, our next problem is whether or not the Bank is bound by what Carter did.

Ten shares of stock, according to the record, remained on the books of the Bank in the name of L. R. Charter, Jr., during the time (January 1, 1930-March 21, 1933) he was commissioner of banking. A year prior to the loan, he became a surety on a $100,000.00 bond of the Bank, payable to C. E. Lawhead, receiver, conditioned for payment of all moneys theretofore or thereafter deposited in the Bank by Lawhead; and in 1931 and 1932 he became surety on certain bonds given by the Bank as depository of public moneys of counties other than Doddridge. He appears to have been active in securing deposits of such public moneys, making trips to secure same, and issuing deposit slips therefor, on which he signed his brother's name as president.

Although we find no direct evidence of knowledge on the part of the Board of Directors as to Charter's activities in respect to the loan, the depositions of those of the board who testified indicate that they took little, if any, interest in the business of the institution. It is virtually admitted that the Bank was controlled by the Charters, particularly L. R., Jr.

Most banking institutions, in 1931, were faced with many trying problems, which called for a close cooperation on the part of those charged with their management. If the directors of the Bank had performed the duties placed upon them as such, they would have known of L. R. Charter's activities on behalf of the institution, especially of the advancement of funds by the Trust Company.

A board of directors of a corporation is not only bound by what it actually knows, but it may be bound by what it ought to have known, or by proper attention to its business would have known. *Baltimore & Ohio R. Co.* v. *Foar* (C. C. A.) 84 Fed. (2d) 67.

"The law will also impute to a corporation knowledge of facts which its directors ought to know, in the exercise of ordinary diligence in the discharge of their official duties, when the imputation of such knowledge to the corporation is necessary to protect the rights of third per-

sons. The directors are presumed to know that which it is their duty to know and which they have the means of knowing." 3 Thompson on Corporations, 354, sec. 1783. The manner in which a corporation's business is conducted may be such as to impute to the board of directors and the corporation knowledge of business transactions entered into by a representative of the corporation. *Beall* v. *Morgantown & Kingwood Railroad Co.,* 118 W. Va. 289, 190 S. E. 333. It is the duty of a director of a banking institution to keep in touch with the general affairs of such institution. *Hatfield* v. *Lamb et al.,* 117 W. Va. 275, 185 S. E. 229.

"Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business." *Martin* v. *Webb,* 110 U. S. 7, 3 S. Ct. 428, 433, 28 L. Ed. 49. In accord: *Seale* v. *Baker,* 70 Tex. 283, 7 S. W. 742, 774, 8 Am. St. Rep. 592; *Fishkill Savings Inst.* v. *National Bank,* 80 N. Y. 162, 36 Am. Rep. 595.

That the Bank was in need of funds in July, 1931, is apparent. The demand deposits of Lawhead, receiver, during a banking crisis, were materially reduced by the transaction and, as we have held, a loan substituted therefor. We are of opinion that the directorate cannot now insist that they were not conversant with the financial condition, or that the Bank was not in fact benefited in the advance of $39,082.88 by virtue of the transaction of July, 1931. Having accepted the benefit of the loan, the Bank is estopped from saying that Charter was not authorized to act for it. "Where a private corporation ac-

cepts the benefit of a contract made on its behalf by unauthorized agent, it thereby ratifies the contract in its entirety and will be bound to perform the obligations provided by the contract to be performed on its part." *Chafin* v. *Main Island Creek Coal Co.*, 85 W. Va. 459, 102 S. E. 291, 292, 11 A. L. R. 657. Accord: *McDermott* v. *Fairmont Gas & Light Co.*, 88 W .Va. 692, 108 S. E. 264; *Smiley* v. *Bank of Wyoming*, 104 W. Va. 471, 476, 140 S. E. 330. So, the Trust Company is entitled to recover the collateral, or the proceeds thereof, from the receiver.

By virtue of a division of the court, as presently constituted, the decree of the circuit court, to the extent indicated, is affirmed.

*Affirmed.*

FOX, JUDGE, dissenting:

The opinion in this case prepared by Judge Riley and concurred in by Judge Maxwell, when translated into an order, will operate to affirm the decree of the court below. Judge Hatcher and myself are unable to concur therein, and this note of dissent is filed in order that our views with respect to the questions arising herein may be made a matter of record.

The controlling issue is whether or not the plaintiff (hereinafter called the Trust Company) loaned to the Doddridge County Bank (hereinafter called the Bank) the sum of $39,082.88, when on the 21st day of October, 1931, it deposited that amount with said bank. We attach little importance to the question of the authority of the person who secured the deposit. It may be that when the Bank accepted the deposit, or loan, it cannot now question the agency through which it was obtained. We think the case is controlled by the legal effect of what was done by the agencies through which the transaction between the two banking institutions was arranged. Nor do we contend that too much stress should be laid upon the form of the transaction, the technical words used, or the manner in which the account was carried on the books of the two banks, except as the same may bear upon the effect thereof upon the rights of depositors in both institutions,

created by their reliance upon the published reports of the two banks reflecting the manner in which the transaction was carried.

With this explanation, we come to the real question in the case. Fortunately, there is little dispute as to the facts. The record, as we understand and interpret it, shows: That in October, 1931, L. R. Charter, Jr., then Commissioner of Banking of the State of West Virginia, and who before assuming that office had been President of the Bank, approached Reese Blizzard, then President of the Trust Company, and inquired of him if his company would be interested in a deposit from C. E. Lawhead, then receiver for a number of closed banks, and upon being answered in the affirmative, then asked the further question: "If he (referring to Lawhead) would make a good sized deposit with you, how would you feel towards making a corresponding deposit in size with the Doddridge County Bank?" and then stated "that the Doddridge County Bank had a good sized deposit from Mr. Lawhead and because he was Banking Commissioner he would rather that this, or at least a part of the deposit would be in some other bank." Blizzard then invited him to his office where the matter was discussed. Inquiry was made by Blizzard as to the financial condition of the Bank, and was assured that it was first class, and its most recent statement of condition was probably exhibited. Blizzard then submitted the proposal to the Board of Directors and the cashier of the Trust Company and secured their approval thereof. No interest was to be paid by either bank on the deposits to be made under this arrangement; the agreement was only to continue for a brief and indefinite period; it was agreed that Lawhead would not draw on his deposit with the Trust Company, and that it would not draw on its deposit or loan with the Bank; and the Trust Company was to hold the Lawhead deposit until the money deposited by it in the Bank was repaid. Following this arrangement, Lawhead, receiver, drew two checks on his account with the Bank, one for $24,542.79 and the other for $14,540.09, both payable to the Trust Company, aggregating the sum of $39,082.88. These checks were delivered to the Trust Com-

pany, one by mail and the other by Miss Charter, a sister of L. R. Charter, Jr., and were immediately endorsed by the Trust Company, and turned over to Miss Charter; who returned them to the Bank. The Trust Company credited the aggregate of these checks to the account of Lawhead, receiver, as an ordinary deposit; and on its general ledger charged the same amount to the Bank and carried the same as a part of its reserve as money due from banks. The Bank credited the two Lawhead, receiver, checks to the account of the Trust Company, as an ordinary deposit. This manner of handling the transaction on the books of the two banks continued to the date of the institution of this suit. Later on Lawhead made withdrawals from his account and made deposits. Objection was made to these withdrawals as not being in keeping with the agreement outlined above. The Trust Company evidently became concerned over the situation. Lawhead, as receiver, was asking it to furnish a bond to cover his account, and matters proceeded to the point where the Trust Company requested the Bank to secure its deposit, and this was done on the 31st of January, 1933, by the execution of a bond by said bank in the penalty of $39,082.88, and the deposit of notes of the face value of $40,001.50, to secure the obligation thereof. The bond and the notes deposited as collateral therewith were delivered to the Trust Company, and the notes were by it returned to the Bank for renewal and collection and to be accounted for by it as the property of the Trust Company. In the bond so executed, prepared by the President of the Trust Company, the sum attempted to be secured thereby is three times described as a "deposit" and in the correspondence appearing in the record, emanating from the Trust Company, the word "deposit" is invariably used with respect to the money held by the Bank. During all this period, and up to the closing of the Bank, in the statement of condition of the two banks furnished the Department of Banking and published as required by law, the Trust Company treated its money held by the Bank as a part of its reserves as money due from banks, and the Bank reported the same money as a deposit subject to check. At no time does it appear, from anything

in the record, that the money deposited with the Bank was treated or considered as a loan until after the Bank was closed in July, 1933.

As we appraise the transaction, thus attempted to be outlined, it amounted to nothing more than a shifting of deposits. It must, of course, be interpreted as of the date of the arrangement entered into in October, 1931. If the monies shifted from one bank to the other, under this arrangement, were in fact deposits in 1931, they remained so until the closing of the Bank. If the money held by that bank was a deposit, the effort made in January, 1933, to secure the same by a bond and collateral was illegal and ineffectual. (Code, 31-4-9.) The reasons for our contention that the Trust Company occupies the position of a depositor are based primarily upon the testimony of its President, and the manner in which the transaction was handled from the beginning. The only matter discussed between Blizzard and Charter was that of shifting deposits. Charter thought the Bank had too much receivership money on deposit. He wanted to hold the deposit for said bank but he wanted to divide it between Lawhead, receiver, and the Trust Company. According to Blizzard, Charter frankly stated what he wanted to do and his reasons therefor. Apparently, Charter wanted to avoid the criticism which might have resulted from too large a deposit of a fund under his control in a bank of which he was formerly the active head. The Trust Company, when this proposal was made, and after inquiring as to the condition of the Bank and being satisfied on that point, agreed thereto. It was understood to be a temporary arrangement. No definite time was fixed as to how long it was to continue; no interest was to be paid; no suggestion of a note or other writing or of any security; just an ordinary transaction in which two friendly institutions were attempting to accommodate each other.

We are unable to see any particular advantage to either bank in what was done. If there were advantages, they were mutual. The Bank secured the reduction of one deposit and a new account to offset the reduction; the

Trust Company secured a new account which, presumably, it considered desirable, and no doubt in the hope that it would be continued after its arrangement with the Bank should be terminated. The agreement as to the withdrawal of the Lawhead deposit was illegal as held by this court in *Commercial Banking & Trust Company* v. *Doddridge County Bank et al.*, 118 W. Va. 37, 188 S. E. 663. Under the ruling in that case, Lawhead always had the right to withdraw his deposit, and under the agreement relied on, the Trust Company would have then been free to withdraw its deposit from the Bank. From whatever angle we approach the question, the facts, as we understand and interpret them, drive us to the conclusion that the money standing on the books of the Bank to the credit of the Trust Company was, at the time it was placed there, and thereafter continued to be, a general deposit and not a loan.

We have no quarrel with the authorities cited in the controlling opinion, which attempt to make a distinction between a deposit and a loan; nor with the holding of the cases cited which are considered as supporting the conclusion reached thereon. As we interpret the facts in the case at bar, they do not approach a parallel with the facts on which the cases cited were decided. We are unable to see anything in this record to support the theory that a loan was ever contemplated or made. There are certain general characteristics of a loan, well known to the business world and practiced therein, all of which, as we view the facts, are absent. Loans are usually made for a fixed period; compensation in the way of a discount or interest charge ordinarily is paid or provided for; customarily, especially in transactions between banks, a loan is evidenced by a note and secured by collateral of the character in which banks deal; and almost universally loans are designated on the books of banks as such, and so designated in reports required to be made and published for the benefit of the public. None of these customary elements of a loan is here present. As indicated above, the substance and not the form should be regarded, but in following this salutary rule, we should not give to the transaction in question an intent and purpose not in-

dicated by anything the parties said or did at the time the arrangement was originally made, or their actions thereunder.

Even if the evidence and circumstances justified the holding that a loan was made, we are still of the opinion that the Trust Company is barred from recovery in this case on grounds of public policy. Not every contract is enforceable. That undefinable something called public policy often steps in to prevent the enforcement of agreements which, as between parties, are clearly established, when such enforcement would be prejudicial to the interest of the public as a whole, or contravene positive law. We think this is a case when the doctrine should be applied. Banking is a quasi-public business, regulated by both state and national governments, and subject to the most minute examination by governmental authorities. Frequent reports on the condition of banks are required in this state. These reports are made to the Department of Banking and condensed reports are required to be published in newspapers in the county where their business is conducted. From these published reports, the public—depositors, actual and prospective—obtain the information on which they base their judgment of banks with which they may desire to do business. These published statements should be made to speak the truth, and no banking institution should ever be permitted, for its own purposes, to set up a different state of facts from that appearing in its report to the Department of Banking or to the public. We think the published statements made by the Trust Company and the Bank did speak the truth. When the Trust Company reported and published that it had a stated reserve, a part of which was money in bank, and included in that reserve the money it had on deposit in the Bank, the public had the right to rely upon that report of its condition, the state of a bank's reserve being often vital to its safety; and when it permitted its money to be held by the Bank as an ordinary deposit and reported as such to the public, it permitted a situation to arise whereby the depositors of said bank were lulled into a sense of security which they might not have felt had the showing been that said bank was borrowing money.

In matters of this kind, the public has an interest which the law should and will protect. If transactions of this character, affecting the business of a bank, can be upheld, there is nothing to prevent the secret preferring of depositors in any bank now being operated in this state. Banks have the power and right to borrow money, but when they do so, it must be an open transaction and carried on its records and reported to the public as a loan and not a deposit. Without any intention to reflect upon the good faith of the Trust Company, we are of the opinion that it is estopped, as against the depositors of the Bank, from asserting any status for its claim other than that of a general depositor.

We concur in that part of the controlling opinion which holds the evidence insufficient to show that the bank was insolvent at the time the Trust Company deposit was made. Therefore, we would reverse the decree of the Circuit Court and dismiss the bill.